**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 16a0589n.06

Case No. 15-3936

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 01, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| PRESTON HARRISON, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**BEFORE: GRIFFIN, WHITE, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge.** Defendant Preston Harrison ("Harrison") challenges his convictions for conspiracy to commit wire fraud, money laundering, conspiracy to commit money laundering, conspiracy to defraud the United States, and filing a false income tax return. Harrison raises one issue on appeal: whether the district court improperly denied his motion for a judgment of acquittal. Specifically, whether there was sufficient evidence to support Harrison's convictions. Because Harrison's arguments against sufficiency of the evidence are unconvincing, we **AFFIRM**.

## I.     FACTS

Harrison and his business partner, Thomas Jackson ("Jackson"), founded Imperial Integrative Health and Research Development, LLC ("Imperial") in 2009. (Appellant Br., at 14.)

Harrison was the president and founder of Imperial, while Jackson was the founder and CEO. (R. 139, PageID # 3573.) Imperial developed and began marketing OXYwater, a sports drink which they touted as being "oxygen-and mineral-enhanced." (Appellant Br., at 14.) To this end, Harrison and Jackson began seeking investors to contribute capital for OXYwater and Imperial.

In 2010, Harrison and Jackson met with Robert Smith ("Smith"), who at the time owned a consulting company. (R. 140, PageID # 3670–72.) During the meeting with Smith, Jackson told Smith that OXYwater was oxygen-enhanced and Harrison did not disagree. (R. 140, PageID # 3675–76.) Harrison and Jackson also told Smith that their goal was "to raise capital and get it to a point where they believe it could be acquired." (R. 140, PageID # 3674.) Harrison and Jackson told Smith that their goal was to raise $8.5 million. (R. 140, PageID # 3674.) Smith initially joined Imperial as a consultant on the Private Placement Memorandum ("PPM")—the document that provided an overview of the company, how funds would be raised, and how much each share would cost—and business plan for OXYwater; however, he subsequently took on the more formal role of Chief Financial Officer ("CFO") of Imperial where he focused primarily on recruiting investors for OXYwater. (R. 140, PageID # 3676–77.) In addition to other suggested changes to the PPM, Smith recommended that Harrison and Jackson increase their start-up amount to $9.5 million. (R. 140, PageID # 3683.) Smith also invested his own money in Imperial. (R. 140, PageID # 3676.)

The PPM, which was given to a number of Imperial's investors, contained information which was subsequently proven to be false. The PPM listed as National Sales Manager Daniel Couts, a former employee of Coke and Vitaminwater; the PPM also listed Kevin Waddle, Michael Skelton, and Matthew Godsey, all former Coke and Vitaminwater employees, as members of the OXYwater sales team, and also included their resumes. (R. 139, PageID #

3574–76.) None of these individuals, however, were ever employed by or associated with Imperial. The PPM further included a section on celebrity endorsements that listed OXYwater's official endorsers as well-known athletes Manny Pacquiao and Gregory Jennings. (R. 142, PageID # 4278–80.) These athletes were never affiliated with OXYwater or Imperial. Even further, the PPM indicated that in the first year, Jackson would receive a salary of $90,000 and Harrison a salary of $60,000. (R. 139, PageID # 3585–86.) These numbers were subject to increase in subsequent years. In reality, Jackson and Harrison were never officially on Imperial's payroll; instead, they appropriated significantly higher amounts for personal use. Finally, the PPM stated that the funds raised would be used for marketing, inventory, payroll, office warehouse lease, and to purchase machinery and commercial vehicles for local delivery to retail accounts. (R. 139, PageID # 3580–81.) While some of the funds were used for legitimate business purposes, bank records, however, indicated that monies from Imperial accounts were also used by Jackson and Harrison for personal expenses. Based on the representations in the PPM and other oral communications, Harrison and Jackson received approximately $9.3 million in investments for Imperial and OXYwater. (R. 143, PageID # 4485.)

Over a series of transfers in 2011, Jackson—the only one of the two with access to Imperial's bank accounts—wired over one million dollars of investor money from Imperial into an account listed under the name of Forever Now, LLC ("Forever Now"). (R. 143, PageID # 4490–92.) Forever Now was an Ohio LLC with a business description that termed it a "child development" company. (R. 142, PageID # 4343.) Harrison and his wife, Lovena, were the sole signatories on the account, and the Ohio Secretary of State records listed Qaylea Harrison, the Harrisons' daughter who was six or seven years old at the time, as the registered agent of Forever Now. (R. 143, PageID # 4511–12, 4514–15.) The Harrisons used the Forever Now account as

their personal bank account, paying for personal assets and a number of home-improvement projects out of the account. (R. 143, PageID # 4457–59, 4464–67, 4477, 4480.) Despite the amount received in the Forever Now account, the Harrisons filed a joint tax return in 2011 claiming a total income of approximately $23,000, (R. 143, PageID # 4507), and Forever Now did not file a tax return in 2011. (R. 143, PageID # 4511.)

In 2012, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") began investigating Harrison and Jackson. (R. 143, PageID # 4447.) As part of this investigation, IRS Agent David Gosiewski reviewed bank transactions from Imperial's accounts and the Forever Now account, and executed search and seizure warrants at the Harrisons' residence. (R. 143, PageID # 4449–50.) The warrant on the Harrisons' home resulted in the seizure of a Cadillac Escalade and a BMW 750, both of which could be traced directly to the Forever Now account, as well as the $520,000 in cash that remained in the Forever Now account. (R. 143, PageID # 4450.) Additionally, a review of the bank activity on the Forever Now account indicated that Lovena made a significant number of cash withdrawals, each time for an amount just under $10,000. (R. 142, PageID # 4344–45.) The FBI and IRS also executed search warrants at the warehouse/corporate location for Imperial, which included a search of specific email addresses and business records. (R. 143, PageID # 4450, 4452.) The business records retrieved included banking records, sales figures, invoices, etcetera. (R. 143, PageID # 4452.) For example, information pulled from the computers located at Imperial's office revealed total sales of $307,000 in 2012, (R. 143, PageID # 4454), as compared to the $1.3 million in sales for August 2012 that was reported to investors. (R. 140, PageID # 3842.)

In May 2014, a federal grand jury indicted Harrison, Jackson, and Lovena on various counts of wire fraud, money laundering, and tax fraud. At trial, the jury heard testimony from

twenty government witnesses, including investors Kendrick Gregory, Aaron Stumpf, Joseph Crispin, Shaun Stonerook, William Culman, and Shaffer Smith—commonly known by his stage name, "Ne-Yo." Following the government's case, the defense rested without presenting any proof. (R. 144, PageID # 4632.) The jury convicted Harrison of one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); twelve counts of money laundering, in violation of 18 U.S.C. § 1957; one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; and one count of filing a false tax return, in violation of 26 U.S.C. § 7206(1). The district court sentenced him to 83 months in prison and ordered restitution in the amount of $8,840,706 to the victims, and $375,985.15 to the IRS.

## II.    SUFFICIENCY OF THE EVIDENCE

Harrison argues that the government did not present sufficient evidence from which a rational jury could conclude that he committed money laundering or that he conspired with Jackson to commit wire fraud or money laundering. Harrison also challenges the sufficiency of the evidence with respect to his conviction for filing a false tax return and conspiring with his wife to do so. For the reasons below, we disagree.

### A.

We review de novo a district court's denial of a motion for judgment of acquittal. *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016). In reviewing whether the evidence presented is sufficient to support a jury verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted) (emphasis in original). We will "reverse a judgment

for insufficient evidence 'only if the judgment is not supported by substantial and competent evidence upon the record as a whole.'" *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013) (quoting *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010)). In so doing, we will not re-weigh the evidence, consider the credibility of the witnesses, or substitute our judgment for that of the jury. *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009) (citation omitted).

## B.

Harrison first argues that the government provided insufficient evidence to support his conviction of conspiracy to commit wire fraud. To establish conspiracy to commit wire fraud under 18 U.S.C. § 1349, the government must demonstrate that "two or more persons conspired, or agreed, to commit the crime of [wire fraud] and that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014) (citation omitted). 18 U.S.C. § 1343 criminalizes the act of wire fraud, and requires proof that a defendant: (1) devised or willfully participated in a scheme to defraud; (2) used or caused to be used an interstate wire communication in furtherance of the scheme; and (3) intended to deprive a victim of property or money. *Id*. at 377 (citing *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010)). A finding of conspiracy does not require proof of formal agreement; a mere tacit understanding among the participants is sufficient. *See United States v. Hamilton*, 263 F.3d 645, 652 (6th Cir. 2001).

Initially, Harrison highlights the fact that although he was convicted of conspiracy to commit wire fraud, the jury ultimately acquitted him of all substantive counts of wire fraud. (Appellant Br., at 44.) Harrison argues that this bolsters his contention that he did not conspire with Jackson. This argument is not as persuasive as Harrison would perhaps prefer, if only

because both the Supreme Court and this Court have upheld such so-called "inconsistent verdicts" where a defendant has been acquitted of a predicate felony, but convicted of the compound felony. *See United States v. Powell*, 469 U.S. 57, 67–69 (1984); *see also United States v. Chilingirian*, 280 F.3d 704, 710–11 (6th Cir. 2002); *United States v. Bischoff*, Nos. 97-1980, 97-1983, 1999 WL 644340, at *1–2, *5 (6th Cir. Aug. 19, 1999) (finding that there was sufficient evidence to convict the defendant of conspiracy to commit wire fraud, even though she was acquitted of wire fraud).

The remainder of Harrison's argument asserts that the evidence presented at trial overwhelmingly points to Jackson as the fraudster, and that the government did not introduce any evidence of communications between Harrison and Jackson to show complicity in the conspiracy, that no evidence was presented to indicate that Harrison drafted the PPM or was even aware of its contents, or that Harrison was aware of the representations made to investors concerning former Vitaminwater employees. According to Harrison, the extent of his involvement was that his name was listed as co-founder and president of Imperial, "and that investor money ended up in the Forever Now account on which he and his wife were the sole signatories." (Appellant Br., at 46.)

We have held that "[t]he existence of a conspiracy 'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (quoting *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)). That there was circumstantial evidence sufficient to support Harrison's conviction is clear. The jury heard testimony at trial that while the majority of the communication on behalf of Imperial was with Jackson, Harrison's involvement in Imperial was never in question. For example, investor Joseph Crispin testified that he never doubted

Harrison's involvement with OXYwater because "[e]verything that was presented was that they were a team . . . I felt like [] I didn't have to communicate with [Harrison], because [Jackson and Harrison] went together for the company." (R. 141, PageID # 4070.) The jury also heard testimony from investor William Gregory who testified that while he rarely spoke to Harrison, he knew what his role was. (R. 140, PageID # 3655–56.) Further, testimony from Daniel Couts, a former Vitaminwater employee who was falsely listed as being employed by Imperial, informed the jury that he was first contacted by Harrison, (R. 141, PageID # 4075–79), talked to Harrison more than Jackson, (R. 141, PageID # 4078–79), told Harrison that he was not interested in joining OXYwater, (R. 141, PageID # 4080–81), and forwarded the names and resumes of possible Vitaminwater recruits—some of whom ended up falsely listed in the PPM as OXYwater employees—to only Harrison. (R. 141, PageID # 4081–83.)

Further, Smith, former CFO and investor recruiter for Imperial, testified that while he did not have much contact with Harrison after he joined, Harrison initially emailed him "pretty much all" the documents, (R. 140, PageID # 3682), told him that Vitaminwater people were joining their team, (R. 140, PageID # 3686), and along with Jackson, provided him with information concerning management compensation. (R. 140, PageID # 3690.) Also important, Smith testified that in the initial meeting pitching OXYwater, Harrison and Jackson gave a "joint presentation" outlining the benefits of OXYwater, and Harrison did not disagree with Jackson's statements about the "oxygen enhanced" attributes of OXYwater. (R. 140, PageID # 3675–76.)

While none of these statements individually constitute smoking-gun evidence of conspiracy, collectively, they are certainly sufficient to allow a jury to infer the existence of a conspiracy. A reasonable juror could conclude that Harrison's "behind the scenes" role, as investor Aaron Stumpf testified he believed, (R. 140, PageID # 3753), was intentional, rather

than proof of his lack of complicity in the fraud. It was within the jury's province to draw this reasonable inference, *see Jackson*, 443 U.S. at 319, and we will not usurp that role.

## C.

Harrison next challenges his conviction for money laundering and conspiracy to commit money laundering. Relying on essentially the same reasoning he uses to challenge his conviction for wire fraud conspiracy, Harrison argues that he played no role in communicating with Imperial's investors and had no reason to know that the money that was transferred into the Forever Now account was illegally obtained. (Appellant Br., at 49.) In sum, Harrison argues that his convictions are based solely on "guilt by association." (Appellant Br., at 50.)

To establish a money laundering conspiracy in violation of 18 U.S.C. § 1956(h), the government must prove that: (1) two or more persons conspired to commit the crime of money laundering; and (2) the defendant knowingly and voluntarily joined the conspiracy. *United States v. Prince*, 618 F.3d 551, 553–54 (6th Cir. 2010). The crime of money laundering itself punishes an individual who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).

As previously noted, the government produced sufficient evidence to allow the jury to reasonably conclude that Harrison, along with Jackson, defrauded Imperial's investors. The government further produced evidence that Jackson transferred money on many occasions to the Forever Now account which the Harrisons used for their personal expenses. (R. 143, PageID # 4490.) One such transfer was the $600,000 transfer from Imperial to the Forever Now account on July 11, 2011. (R. 143, PageID # 4491–92.) Even further, the evidence presented at trial indicated that the Harrisons spent in excess of $73,000 installing a pool in their home, (R. 143,

PageID # 4457–59), $47,000 on a Cadillac Escalade, (R. 143, PageID # 4477), $38,887 on a BMW, (R. 143, PageID # 4480), and nearly $10,000 on jewelry. (R. 143, PageID # 4467.) These expenses, among others, were paid for directly from the Forever Now account which, the evidence indicated, was funded directly from the money invested in OXYwater.

Importantly, Harrison does not claim that he had no knowledge of the existence of the Forever Now account, the amount contained in the account, or the source of the money. (*See* Appellant Br., at 48–50.) Rather, Harrison acknowledges using the account as his personal bank account, but argues that he did not know the money was being obtained by fraud. Having concluded that the jury had sufficient evidence to find the existence of a wire fraud conspiracy, this argument is unpersuasive. There was ample evidence presented at trial for a jury to conclude that Harrison knew that the money being transferred from Imperial into his Forever Now account was derived from fraudulent representations made to investors.

### D.

Finally, Harrison challenges his tax-fraud-conspiracy and tax-fraud convictions. Harrison argues that the government did not produce sufficient evidence to show that it was he and not his wife that prepared the tax return. Under 26 U.S.C. § 7206(1), any person who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" is guilty of tax fraud. Conspiracy to defraud the United States under 18 U.S.C. § 371 requires proof "that there was an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Damra*, 621 F.3d 474, 498 (6th Cir. 2010) (citation omitted).

Agent Gosiewski testified at trial that the Harrisons reported an income of approximately $23,000 on their joint tax return for 2011. (R. 143, PageID # 4507.) The tax return reported the income as coming from Aunt Venas Daycare and listed Harrison's occupation as "none." (R. 143, PageID # 4507–08.) Based on this reported income, the Harrisons claimed an earned income credit and a child tax credit totaling $8,360, which allowed them to receive a refund of $5,238. (R. 143 PageID # 4508–09.) The jury also heard testimony that because many of the transfers made to Forever Now from Imperial were dubbed "salary," those amounts should have been reported as income. (R. 143, PageID # 4510.) Even further, testimony at trial indicated that Forever Now did not file a tax return in 2011. (R. 143, PageID # 4511.)

Harrison does not dispute that the money in the Forever Now account was not included in his and Lovena's joint 2011 tax return. Rather, Harrison points out that the return was submitted electronically using Personal Identification Numbers ("PINs"), and that Agent Gosiewski testified that there is no way to know who actually submitted the electronic return. (R. 143, PageID # 4510–11, 4557.) Based on this, Harrison argues that there is insufficient evidence to support the conclusion that he rather than his wife actually prepared and filed the return, and that "assuming Lovena prepared and filed the return," there is insufficient evidence to conclude that Harrison "was aware of its contents and joined his wife's deception." (Appellant's Br., at 50–52.) At trial, however, Agent Gosiewski testified regarding electronic tax returns and explained that PINs are used in place of actual signatures,[1] and that Harrison and his wife had individual PINs, although they used the same sequence of digits for their individual PINs. (R. 143, PageID # 4510–11, 4556.) He further testified that the return listed Harrison as the taxpayer and Lovena

---

[1] A tax document filed using an electronic signature "shall be treated for all purposes (both civil and criminal, including penalties for perjury) in the same manner as though signed or subscribed." 26 U.S.C. § 6061(b)(1).

as the taxpayer's spouse, (R. 143, PageID # 4540, 4556), that the person who is listed as the taxpayer is ordinarily the person who prepared the return, (R. 143, PageID # 4557), and that the electronic filer is informed that declarations on a return are made under penalty of perjury. (R. 143, PageID # 4510–11.) This evidence, coming from an experienced special agent with the Criminal Investigation Division of the IRS, was more than sufficient for a rational jury to find that Harrison willfully filed a false return.[2]

In challenging the conspiracy to defraud the United States charge, Harrison argues that there is no support for this conviction because of the absence of evidence concerning interaction or communications between him and his wife with respect to filing a false return. Unfortunately for Harrison, his reliance on whether there was direct evidence of an agreement or a record of communications between him and his wife to commit tax fraud is misplaced. As we have previously noted, "a defendant's agreement to participate in a conspiracy can be inferred." *Damra*, 621 F.3d at 496 (citation omitted). Agent Gosiewski testified to the existence of Aunt Venas daycare as a registered business with Lovena listed as the registered owner. (R. 143, PageID # 4546.) He also testified that the return reflected the profit and loss of the daycare. (R. 143, PageID # 4546.) Based on the evidence that both Harrison and his wife were listed on the return, the return was electronically signed by both of them and listed Harrison as the taxpayer and Lovena as the spouse, and Harrison was aware of the large amounts of money coming into the family unit for cars and other personal expenses, the jury's decision to infer a conspiracy here was rational and well supported by the evidence.

---

[2] This Court has already affirmed Lovena Harrison's tax-fraud and tax-fraud conspiracy convictions arising out of the return. Order Affirming Convictions, *United States v. Lovena E. Harrison*, No. 15-3925, at 3 (6th Cir. Apr. 6, 2016) (per curiam) (unpublished) (concluding that "[a] rational trier of fact could have found beyond a reasonable doubt that Harrison 'made and subscribed' the return" based on the presence of her PIN). Both PINs were on the return, and the same conclusion applies here.

### III.    CONCLUSION

Harrison expends considerable energy pointing fingers at his wife, Lovena, and Imperial co-founder, Jackson.  The jury did not credit this attempt to deflect responsibility, and when we view the evidence in the record as a whole, we find no reason to reverse.  The district court did not err in denying the motion for acquittal.  We **AFFIRM.**