RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0353p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee*,

  *v.*

LAITH WALEED ALEBBINI,

  *Defendant-Appellant*.

No. 19-3647

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:17-cr-00071-1—Walter H. Rice, District Judge.

Argued: October 20, 2020

Decided and Filed: November 5, 2020

Before: McKEAGUE, GRIFFIN, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Vipal J. Patel, UNITED STATES ATTORNEY'S OFFICE, Dayton, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Vipal J. Patel, Dominick S. Gerace II, UNITED STATES ATTORNEY'S OFFICE, Dayton, Ohio, Justin Sher, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────────

## OPINION

─────────────────

JOHN K. BUSH, Circuit Judge. On April 26, 2017, FBI agents arrested Laith Waleed Alebbini at the Cincinnati-Northern Kentucky International Airport. They suspected that he was

attempting to travel to Turkey and then Syria to join the Islamic State of Iraq and Syria ("ISIS")—a designated foreign terrorist organization. A grand jury in the U.S. District Court for the Southern District of Ohio returned an indictment charging Alebbini with attempting and conspiring to provide material support and resources to ISIS. Soon thereafter, Alebbini waived his right to trial by jury, and the case proceeded to a bench trial before the district court. After hearing evidence and arguments for ten days, the district court found Alebbini guilty on both counts.

On appeal, Alebbini challenges the sufficiency of the evidence for both of his convictions. First, he argues that the proof was insufficient to convict him of conspiring to provide material support to ISIS because it did not demonstrate that he entered into any kind of agreement with his alleged co-conspirator and cousin, Raid Ababneh. Second, he argues that the evidence was insufficient to convict him of attempting to provide material support to ISIS because it did not demonstrate that he took a substantial step towards the crime charged, or that he intended to work under the direction and control of ISIS. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crimes charged beyond a reasonable doubt. We therefore **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Alebbini's Visit to the Turkish Embassy

Laith Alebbini is a Jordanian national who immigrated to the United States in 2009 and became a permanent resident in 2014. On January 10, 2017, after years of researching ISIS and the greater conflict in Syria, Alebbini drove from his home in Gordonsville, Virginia to the Turkish embassy in Washington, D.C. He hoped to meet with the Turkish Ambassador to discuss the Syrian conflict. Although it was illegal to enter the embassy compound in an unauthorized vehicle, Alebbini drove in and parked. Predictably, law enforcement was notified, and escorted Alebbini off embassy grounds. As he was escorted away, Alebbini reportedly turned toward the Turkish embassy and shouted, "you are going to regret this!"

**B.  The FBI's Visit to Alebbini's Residence**

Two weeks later, on January 23, 2017, two federal agents showed up at Alebbini's home and asked to speak with him about the incident at the embassy.  He obliged.  The interview began as a formality—the agents simply needed to get some information about why Alebbini had gone to the Turkish embassy.  It ended with the agents seeking to open an FBI investigation into Alebbini's conduct.  During the interview, Alebbini told the agents that Facebook deactivated his social media account because he had posted pro-ISIS videos.  He mentioned that he agreed with ISIS's overall goals but not necessarily with their means of achieving those goals.  He also told the agents that he attempted to join the U.S. Military to fight against Syrian forces and that he was not a terrorist, but that he "would be the perfect recruit for ISIS."  Alebbini further added, in jest, that the Turkish embassy had such poor security that if he had a bomb that day, he could have taken down three embassies.

The agents viewed Alebbini's statements as red flags and inquired into his recent travels.  According to the agents, the only foreign destination Alebbini reported traveling to was Canada.  After some independent research, however, the agents discovered that Alebbini had in fact traveled to Turkey with his cousin, Raid Ababneh, a week prior to the interview, allegedly to fight Bashar al-Assad with the Syrian opposition forces.  But Alebbini's passport was expired, so Turkish authorities denied him entrance into the country and sent him back to the United States.  According to Alebbini, Raid made it through, but he "got caught."  Based on that new information, the interview at Alebbini's home, and a formal background check, the FBI opened a full investigation into Alebbini.

**C.  The FBI's Investigation**

After about a month of surveillance, the FBI learned that Alebbini had moved to Dayton, Ohio with his wife, Destiney Eshelman, and his cousin, Raid.  So FBI Special Agent Michael Herwig reached out to the FBI's Joint Terrorism Task Force in Dayton to continue their surveillance of Alebbini.  One of the task force agents had a confidential source who had worked with the task force in the past and who happened to know Alebbini's wife.  From early March

2017 until Alebbini's arrest in late April 2017, the informant had several recorded conversations with Alebbini and Raid, most of which were in Arabic.

In one conversation, Alebbini justified ISIS burning a Royal Jordanian Air Force pilot alive as payback for "help[ing] America against us."  He claimed that "the only one who shows the truth is honestly the Islamic State Organization."  At various points, Alebbini also discussed how he had watched pro-ISIS videos.  For example, Alebbini recounted a time when he and Raid were sitting in front of his laptop, watching ISIS videos, and Raid tossed the laptop and said, "Man why are we waiting over here? Let's act . . . . I want to go."  Alebbini further described his hatred for Syrian President Bashar al-Assad and how he wanted to "fight alongside the Islamic State."  When asked if he knew how to get to the Islamic State, Alebbini reported to the informant that he would need to book a flight to Jordan, with a layover in Turkey, and that he would need to purposefully miss his connecting flight to Jordan, and then make his way to the Islamic State through Turkey.  He told the informant that he was not concerned about being caught: "Whoever wants to catch me . . . Jordan catches me, America, anywhere . . . let whoever wants me catch me."  But he also cautioned that their conversations might be monitored, so they should not use their phones to discuss ISIS.  If asked, Alebbini noted, "We can say that we are talking about opposition and a revolution."

At some point, Alebbini began to backtrack from his expressed interest in ISIS.  The informant suspected that his cover had been blown and that Alebbini was testing him.  Nevertheless, at the end of March 2017, Alebbini commented to the informant that "the truth is crystal clear," and alluded to him and Raid reaching "the execution phase" of some unidentified plan.  He asserted: "our duty is to support the Islamic State. . . . What's our duty? Jihad. So, a person must be, I mean, must distance himself from the people of sin until it happens . . . and if it happens and he is captured; then let them capture him[.]"

Alebbini further confided in the informant after his cousin Raid got into trouble overseas.  He told the informant that in March, Raid had gone to Jordan, where he was arrested by counterterrorism forces who suspected him of traveling to join ISIS.  Alebbini mentioned that "someone reported us," alluding to a suspicion that Raid's name was provided to the authorities

based on the ISIS videos he and Raid watched, the conversations they had, and their "thinking." Alebbini also expressed his concern that Raid might implicate him while imprisoned in Jordan.

That information raised more red flags for the FBI, so their investigation continued.  In one surveilled conversation, Alebbini told his cousin, Mohammad Ababneh, that he and Raid "pledged together."  He further explained that they "were supposed to leave together" to Jordan but that Raid went ahead of him, that he "started asking and acting on his own," and that he "asked some people about the [Islamic] State," which resulted in his capture.  In a separate conversation, another cousin of Alebbini's, Qasim Ababneh, expressed fear that after being captured by Jordan's counterterrorism unit, Raid would confess to "everything you and he had planned."  Alebbini replied, "By God I told him, not to call or ask and that I will."

In late April, Alebbini's brother Hossam reached out to one of Alebbini's cousins, Hussein Ababneh.  He told Hussein that Alebbini was making plans to travel to Syria but that he could not disclose more information over the phone.  He asked Hussein to speak to Alebbini and pleaded with him to refrain from giving Alebbini any money to buy a plane ticket.  Hussein thought Alebbini might be trying to join ISIS in Syria, so he immediately called Alebbini.  A six-hour conversation ensued.

During that conversation, Hussein tried to talk Alebbini out of traveling to the Middle East to join ISIS, but Alebbini insisted, "I am going to join these people because they are right. . . . I am 100 percent positive and I know, and I've seen through evidence and proof that they are right."  Alebbini also defended ISIS's leader at the time, Abu Bakr al-Baghdadi, and spoke as if he had already joined ISIS, telling Hussein, "America will not let us be. . . . [T]he solution . . . is to bear arms."  When asked whom he would fight with and against, Alebbini responded, "the State Organization" and "any regime that follows the US government."  He contemplated being a "martyrdom bomber," and that "[t]o fight America" he would offer himself up as "bait."  He reiterated, "I must fight. I am a soldier!"  He also spoke of ISIS's structure and how it assigned members to specific posts, and he told Hussein that he had been closely researching and studying the Islamic State for years.  He believed it was his duty to go and fight.

**D. Alebbini's Arrest**

By April 25, 2017, Alebbini was set to travel overseas to Turkey. On that date, he exchanged a series of WhatsApp messages with his family. He sent his father an ISIS-related Youtube video accompanied by the following message: "Watch this video. So you know the truth." His father replied that Raid had confessed to everything and pleaded with Alebbini to refrain from following through with whatever he was planning.

Alebbini did not listen. The following day, April 26, 2017, he left for the Cincinnati-Northern Kentucky airport with his wife, a drive that would take them about an hour and a half. Before arriving at the airport, however, he received a message from an old friend, pleading that he not leave. Alebbini responded: "Do you think I am a criminal . . . I am a terrorist . . . I am mujahid." Shortly after sending that message, around 3:30 p.m., Alebbini arrived at the airport. He went to the ticket counter, waited approximately 30 minutes, and obtained his and his wife's boarding passes. He then walked from the ticket counter and appeared to make his way toward the TSA checkpoint. But before he made it to the airport's security area, FBI agents apprehended him.

Once in custody, Alebbini waived his *Miranda* rights and agreed to speak to the agents. He told the agents he had a ticket to take him to Turkey and then to Jordan, but that he intended not to take his connecting flight to Jordan because he was wanted by Jordanian authorities. When asked about ISIS, Alebbini spoke positively, defended the organization, and referred to it in the first-person plural, "we," as if he had already joined. He told the FBI how he and his cousin Raid developed the same beliefs about ISIS from watching Youtube videos online, and that "the plan was that I go [to the Islamic State] first" and that Raid would follow. He said he did not want to kill people, but he justified ISIS's killings and noted that once he was released from prison, his country was "going to be the Islamic State." Finally, in response to questions about his lack of contact with ISIS, he said he did not contact "people from there" because it would raise suspicion. He did not want connections until he got to Turkey. Ultimately, the FBI agents believed their suspicions had been confirmed, so they arrested Alebbini.

**E.  Procedural History**

On May 11, 2017, approximately two weeks after Alebbini's initial arrest, a grand jury indicted Alebbini for attempting to provide material support and resources to a foreign terrorist organization (ISIS), in the form of personnel (namely, himself), in violation of 18 U.S.C. § 2339B(a)(1).  A year later, on May 22, 2018, the Government filed a superseding indictment against Alebbini, adding the charge of conspiracy to provide material support and resources to ISIS, also in violation of 18 U.S.C. § 2339B(a)(1).  Alebbini waived his right to a jury trial, and District Judge Walter H. Rice held a ten-day bench trial.  After hearing evidence and argument from Alebbini and the Government over those ten days, the district court found Alebbini guilty on both counts and sentenced him to 180 months imprisonment.  Alebbini appealed, challenging the sufficiency of the evidence for both of his convictions.

## II.  DISCUSSION

We review challenges to the sufficiency of evidence de novo.  *See United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015).  Still, the defendant "bears a very heavy burden."  *Id.* (quoting *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)).  In evaluating a sufficiency challenge, we must affirm a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see United States v. Miller*, 696 F. App'x 696, 699–700 (6th Cir. 2017) (applying the same standard where, as here, the trial judge was the trier of fact).  "[W]e do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the [trier of fact], and [c]ircumstantial evidence alone is sufficient to sustain a conviction, even if it does not remove every reasonable hypothesis except that of guilt . . . ."  *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (first and third alteration in original) (internal quotation marks and citations omitted).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.

On appeal, Alebbini contends that there was insufficient evidence to support his conviction for conspiracy to provide material support to a terrorist organization (Count 2), and attempting to do the same (Count 1).  We address each contention in turn.

### A.  Sufficiency of the Evidence for Count 2: Conspiracy

Alebbini was convicted of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B(a)(1).  To establish a violation of § 2339B(a)(1), the government had to demonstrate that Alebbini knowingly provided or attempted or conspired to provide material support to a foreign terrorist organization that he knew had been designated a foreign terrorist organization or had engaged in terrorism.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (citing 18 U.S.C. § 2339B(a)(1)).  To establish a conspiracy under § 2339B(a)(1), the government had to prove (1) the existence of an agreement between two or more persons to violate the law, and (2) that defendant knowingly and voluntarily joined the conspiracy.[1]  *See* Sixth Circuit Pattern Jury Instruction 3.01A; *see also United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014).  Alebbini challenges the sufficiency of the evidence as to the first element—the existence of an agreement.

"A finding of conspiracy does not require proof of formal agreement; a mere tacit understanding among the participants is sufficient."  *United States v. Harrison*, 663 F. App'x 460, 464 (6th Cir. 2016).  That tacit understanding need not be proven by direct evidence; it "may be proven by circumstantial evidence, including by the defendant's participation in a common plan."  *United States v. Lang*, 717 F. App'x 523, 545 (6th Cir. 2017).  Alebbini contends that there is a lack of evidence in the record that his co-conspirator and cousin, Raid, knew of or agreed to join in a conspiracy.  We disagree.

---

[1]Alebbini mentions in his opening brief that a third element is required to prove conspiracy under § 2339B(a)(1): "an overt act constituting actual participation in the conspiracy."  He does not, however, discuss that over act requirement, nor does he respond to the Government's warranted objection.  In drafting section § 2339B, Congress omitted any language requiring an overt act. *See* 18 U.S.C. § 2339B(a)(1).  We will not read an overt act requirement into the statute. *See Whitfield v. United States*, 543 U.S. 209, 213 (2005) ("[W]here Congress had omitted from the relevant conspiracy provision any language expressly requiring an overt act, the Court would not read such a requirement into the statute."); *United States v. Moalin*, 973 F.3d 977, 1006–07 (9th Cir. 2020) (holding that § 2339B(a)(1) does not require proof of an overt act); *United States v. Abdi*, 498 F. Supp. 2d 1048, 1064 (S.D. Ohio 2007) (same).

There was sufficient evidence from which a rational trial judge could find an agreement to substantiate Alebbini's conviction for conspiracy under § 2339B(a)(1). As the Government describes, the bulk of the evidence was presented in three categories: (1) recorded conversations between Alebbini and the Government's informant, (2) recorded conversations between Alebbini and his friends and family, and (3) Alebbini's post-arrest interview.

In his conversations with the Government's informant, Alebbini alluded to him and "Raid . . . reach[ing] the execution phase" of some unidentified plan. And after discovering that Raid was arrested in Jordan for intending to join ISIS, Alebbini told the informant that Raid was arrested because "someone reported us," alluding to a suspicion that Raid's name was provided to Jordanian authorities based on the ISIS videos he and Raid watched, the conversations they had, and their "thinking." He recollected one episode where, after watching a particular ISIS video, Raid "tossed the laptop" and said, "Man, why are we waiting over here? Let's act . . . . I want to go." And he conveyed to the informant his concern that Raid might implicate him while imprisoned in Jordan.

The Government also produced evidence from Alebbini's conversations with certain relatives. In one conversation, Alebbini's cousin Qasim told Alebbini that after being captured by Jordan's counterterrorism unit, Raid would confess to "everything you and he had planned." Out of apparent frustration, Alebbini replied, "by God I told him, not to call or ask and that I will"—referring to Raid's asking around for information about ISIS and signaling the pair's common plan to contact the organization.

In another conversation, Alebbini told his cousin Mohammad that he got into an argument with Raid's father when he and Raid "pledged together." Alebbini also provided context to that pledge, noting that he and Raid "were supposed to leave together" to Jordan but that Raid went ahead of him, that he "started asking and acting on his own," and that he "asked some people about the [Islamic] State," which resulted in his arrest.

That information was also corroborated in Alebbini's post-arrest interview. Alebbini told the FBI how he and Raid developed the same beliefs about ISIS from watching Youtube videos. To them, he said, ISIS is not made up of "a bunch of killers . . . the wide majority . . . [are]

regular people who want[] peace and justice." Alebbini also told the FBI that "the plan was that I go [to the Islamic State] first" and that Raid would follow.

From that evidence, a rational factfinder could conclude beyond a reasonable doubt that there was an agreement between Alebbini and Raid to provide material support to ISIS. To the extent there was evidence to the contrary, the district court was under no duty to credit that evidence. And we will not substitute our judgment for the district court's to decide the issue. *See Hendricks*, 950 F.3d at 352.

Alebbini does not assert that the evidence identified above is insufficient because of its quantity, or because it was somehow taken out of context. Rather, he argues that the evidence was insufficient to prove Raid's agreement to join the conspiracy because he, Alebbini, was the exclusive source of the evidence. Put differently, he argues that the intent or state of mind of one alleged co-conspirator—here, Raid—cannot be demonstrated through the statements of another. We find Alebbini's argument unpersuasive.

First, the district court did not exclusively rely on Alebbini's statements to find an agreement between Alebbini and Raid. It found that "Mr. Alebbini's coconspirator was Raid Ababneh" and that the "agreement between them is proved by Mr. Alebbini's words and frankly by the actions of Raid and by the consequences that occurred to Raid." Specifically, the court cited Alebbini's statements concerning Raid's state of mind, Raid's travel to the Middle East, his inquiry into ISIS's location, and Raid's eventual imprisonment by Jordanian counterterrorism authorities.[2]

There is sufficient evidence in the record to support those findings, even without relying exclusively on statements from Alebbini. For example, in one recorded conversation, Alebbini's cousin, Qasim Ababneh, confirmed that Raid had traveled to the Middle East, asked around about ISIS's location, and had been arrested in Jordan by a Jordanian counterterrorism unit for

---

[2]The district court also cited statements that Raid allegedly made to the FBI. However, there is nothing in the record indicating that Raid was ever interviewed by the FBI. Raid appeared to be in a Jordanian prison during the relevant time period. The discussion the district court cited was likely a reference to an interview that Alebbini had with the FBI after his arrest. Counsel for Alebbini confirmed this at oral argument and does not allege that the district court's apparent misstatement plays any role in this appeal.

attempting to join ISIS. As mentioned previously, Qasim also expressed fear to Alebbini that after being captured, Raid would confess to "everything you [(Alebbini)] and he [(Raid)] had planned." The Government also introduced video evidence at trial showing Alebbini, Raid, and the Government's informant watching an online video titled, "[T]he Islamic State From A to Z." And the informant testified that both Alebbini and Raid exhibited strong support for ISIS during that screening.

Second, even if the district court had exclusively relied on Alebbini's statements, Alebbini cites no authority to support his argument that a defendant charged with conspiracy cannot be the exclusive source of evidence showing his co-conspirator's agreement. There appears to be no such rule in this or any other circuit. And we decline to fashion such a rule in this case. Alebbini relayed consistent information about Raid's intentions and actions to multiple individuals. And the district court was within its authority to infer from that evidence that an agreement between Alebbini and Raid to provide material support to ISIS had been formed. *See, e.g.*, *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) ("[A] conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." (quoting *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir. 1985))).

Alternatively, Alebbini claims that if his statements are to be the exclusive source of evidence, the Court should vacate his conviction because he disavowed Raid's involvement in lending material support to ISIS when speaking with the Government's informant. After reviewing the portions of the record cited by Alebbini, we find no such disavowal. Even if Alebbini's disavowal is somewhere in the record, the district court was under no duty to credit it, given the other, contradictory evidence produced at trial.

### B. Sufficiency of the Evidence for Count 1: Attempt

Alebbini was also convicted of attempting to provide material support to ISIS, again in violation of 18 U.S.C. § 2339B(a)(1). To establish attempt under § 2339B(a)(1), the Government had to prove four elements: (1) that Alebbini intended to commit the crime of providing material support or resources to ISIS; (2) that he intended to provide himself to ISIS to work under its direction and control; (3) that he knew ISIS was a designated foreign terrorist

organization or had engaged in terrorist activity; and (4) that he did some overt act which was a substantial step toward committing the crime. Transcript of Verdict Proceedings, R. 112, PageID 2453; *see United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005).

Alebbini challenges the sufficiency of the evidence as to elements two and four. He primarily argues that he had not taken a "substantial step" towards the commission of the crime at the time of his arrest. Secondarily, he argues that he did not intend to provide himself to ISIS to work under its direction and control. We address each argument in the order raised by Alebbini.

### 1. Element 4: Substantial Step

A substantial step must consist of "objective acts that mark the defendant's conduct as criminal in nature." *Wesley*, 417 F.3d at 618–19. Under this analysis, we evaluate "whether any reasonable person could find that the acts committed would corroborate the firmness of a defendant's criminal intent." *Id.* at 619 (quoting *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999)). "A substantial step must be something more than mere preparation." *United States v. Bailey*, 228 F.3d 637, 640 (6th Cir. 2000) (internal quotation marks and citation omitted). "Evidence is sufficient to sustain a conviction for criminal attempt, if it shows that the defendant's conduct goes beyond 'preliminary activities,' and a 'fragment of the crime [was] essentially . . . in progress.'" *United States v. Price*, 134 F.3d 340, 351 (6th Cir. 1998) (alteration in original) (quoting *United States v. Dolt*, 27 F.3d 235, 239 (6th Cir. 1994)).

After recounting the evidence supporting Alebbini's intent to provide material support to ISIS, which Alebbini does not contest, the district court found that Alebbini took a substantial step toward the crime when he "left the ticket area at the Greater Cincinnati International Airport and headed toward the security area on his way to the gate . . . in order to board the plane that would take him to Turkey . . . ." Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that those actions constituted a substantial step, beyond mere preparation, towards the commission of the crime charged.

Our precedent supports that conclusion.  For example, in *United States v. Wesley*, we held that the defendant—convicted for attempted armed robbery—had taken a substantial step even though he was arrested at his home, an hour away from the bank, by himself, and without a weapon or disguise.  417 F.3d at 619–20.  His overt acts consisted of his discussing the bank robbery with his co-conspirators, checking out the bank, and picking the getaway route.  *Id.* at 620.  As discussed above, there was evidence at trial that Alebbini similarly discussed plans to join ISIS with his co-conspirator, Raid.  There was also evidence that he had discovered a viable route to ISIS.  And more than the defendant in *Wesley*, on the day of his arrest, Alebbini actually started on his route.  He left his home in Dayton, Ohio, drove over an hour away to the Cincinnati-Northern Kentucky International Airport, obtained a boarding pass, and made his way towards the security checkpoint to then board a flight to Turkey.  In *Wesley*, the court held that the defendant's conduct corroborated his subjective intent to commit the crime charged.  *Id.*  So too here.  Alebbini's conduct sufficiently corroborates his subjective intent to attempt to provide material support to ISIS.

Alebbini's arguments to the contrary are unpersuasive.  He contends that a rational trier of fact would have no way of knowing whether he was headed towards the security area, and his gate, simply because he was walking in that direction.  He asserts that he could have been walking towards the bathroom, or perhaps the Starbucks located near the TSA checkpoint.  That argument has no merit.  First, Alebbini points to nothing in the record indicating that his alleged alternative rationale for being at the airport was raised to the district court.  Second, as highlighted above, the evidence demonstrates that Alebbini traveled over an hour away from his home in Dayton to the airport, obtained a boarding pass, and made his way to the security checkpoint.  There was even evidence that Alebbini communicated his farewells, as well as his support for ISIS, to family and friends before leaving for the airport.  It was entirely appropriate for the district court to infer from that evidence that Alebbini was heading to board a plane to Turkey or Jordan.  To suggest, as Alebbini does, that the evidence is more consistent with a trip to the bathroom or for a cup of coffee—or even insufficient to establish the district court's conclusion—is folly.

Alebbini also claims that he could have reconsidered his actions before getting in line to board his flight. That argument, too, is without merit. Alebbini points to nothing in the record indicating that the district court heard evidence that Alebbini was reconsidering his actions while at the airport.[3] Moreover, if "withdrawal, abandonment and renunciation, however characterized, do not provide a defense to an attempt crime," *United States v. Shelton*, 30 F.3d 702, 706 (6th Cir. 1994), then the *possibility* of withdrawal, abandonment, or renunciation does not either.

Finally, Alebbini argues that two cases from the Second Circuit require the Court to vacate the district court's judgment. We disagree. Those out-of-circuit cases, of course, are not binding, but in any event they are distinguishable. In the first case, *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011), the defendant, Sabir, met with an undercover officer in the Bronx who purported to be an al Qaeda member, swore an oath of allegiance to al Qaeda, promised to be on call to treat wounded al Qaeda members, and provided contact numbers for al Qaeda members to reach him. *Id.* at 149. The Second Circuit held those actions to be a substantial step toward providing material support to al Qaeda. *Id.* But that does not mean that Alebbini's actions do not constitute a substantial step. To be sure, Alebbini did not meet with a fake ISIS member. But he did drive approximately 75 miles from his house to an airport and obtain a boarding pass to travel to Turkey. There was no indication that Sabir even attempted to leave the Bronx, let alone travel to Saudi Arabia. *Id.*; *see also id.* at 179 (Dearie, C.J., dissenting) (noting that the location in question was almost 7,000 miles away). And although Alebbini did not swear an oath like Sabir, there was evidence that he pledged with Raid to join ISIS's cause. Finally, although Alebbini did not provide his contact information to any purported ISIS members, not doing so appeared to be a strategic decision to avoid suspicion. He told the FBI in his post-arrest interview that he did not make contact with "people from there" because it

---

[3]In his reply brief, Alebbini points to evidence that he at some point doubted ISIS, and that he was interested in fighting the President of Syria, Bashar al-Assad, not joining ISIS. But that evidence is not relevant as it does not involve Alebbini's objective actions while at the airport. Even if it were relevant, the district court was under no obligation to credit it. In fact, there was other evidence that disputed the validity of the evidence Alebbini points to. That other proof indicated that Alebbini was perhaps lying about not wanting to join ISIS and only wanting to fight Assad—it was alleged to have been a cover story concocted so as not to raise further suspicion. Our role is not to weigh any of this evidence. *See Jackson*, 443 U.S. at 319. The district court already did.

wouldn't be safe: "they will say that [I] got connections with them." He admitted that he "didn't want connections" until he got to his destination.

Alebbini's actions are thus also not far afield from the defendant's actions in the second case Alebbini cites, *United States v. Pugh*, 945 F.3d 9 (2d Cir. 2019). There, the Second Circuit held that the defendant, Pugh, took a substantial step towards attempting to provide material support to ISIS even though he, like Alebbini, made no ISIS connections. *Id.* at 20–21. Further like Alebbini, Pugh had not sworn a formal oath to ISIS. *Id.* The Second Circuit found it significant, however, that Pugh flew to Turkey, was denied access into the country, and eventually was sent to the U.S. for questioning. *Id.* It was also deemed significant that when he was arrested, Pugh was wearing a tactical backpack and was carrying maps with directions to ISIS camps in addition to electronic devices—some of which he attempted to destroy—containing ISIS propaganda and materials. *Id.* Similarly, Alebbini had previously flown to Turkey, but had been denied access to the country, and he had more recently attempted to fly back to Turkey before being arrested by authorities.[4] And although Alebbini did not have a tactical backpack or maps when he was arrested, his phone—which he attempted to wipe so authorities would not be able to see his search history—did contain evidence of ISIS propaganda materials.[5]

Nevertheless, our decision would remain the same even if the evidence in *Farhane* or *Pugh* could be construed as more extensive than the evidence produced in this case. Lesser

---

[4]If Alebbini is correct in suggesting that his first trip to Turkey is not relevant conduct for purposes of the substantial step analysis, it does not follow that Pugh's actual travel to Turkey, compared to Alebbini's trip to the airport, provides a floor for what can be considered a substantial step, thus distinguishing his case from Pugh's such that his conviction should be vacated. As Alebbini recognizes, the Government does not have to prove that the Defendant did everything except the last act necessary to complete the crime of attempt. That makes sense. "[I]f the law punished only the very last act necessary to accomplish the criminal result, legal intervention would be delayed to a point at which it may well be too late to prevent harm." *United States v. Crowley*, 318 F.3d 401, 408 (2d Cir. 2003). As in *United States v. LaPointe*, 690 F.3d 434, 444 (6th Cir. 2012), where "[t]he police did not need to wait until [the defendant] left his house before arresting him," here, the FBI did not need to wait until Alebbini got on the plane to Turkey, or arrived in Turkey, before arresting him.

[5]The Government was ultimately able to introduce evidence showing that the day before leaving for the airport, Alebbini messaged his father and mother an ISIS-related Youtube video from his phone and said, "Watch this video. So you know the truth." The Government also recovered some information from his phone indicating that he had checked out the video multiple times before and that he watched several other ISIS propaganda videos around that same time.

conduct is not precluded from being considered a substantial step because there exist cases involving more extreme conduct. *United States v. Vaught*, 133 F. App'x 229, 234 (6th Cir. 2005).

## 2. Element 2: Direction and Control

As to the second element of attempt, the Government had to prove that Alebbini intended to provide himself to ISIS to work under its direction and control. According to § 2339B, "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. 2339B(h); *see Humanitarian Law Project*, 561 U.S. at 36 (emphasizing that the statute "avoid[s] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups"). On appeal, Alebbini does not raise this type of argument. Instead, he simply argues there was no evidence at trial supporting the district court's judgment that he intended to place himself under the direction and control of ISIS.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that Alebbini intended to provide himself to work under the direction and control of ISIS. That evidence included statements by Alebbini to his cousin, Hussein, six days before heading to the airport, suggesting Alebbini intended to submit to ISIS's command structure:

> The Islamic State is fighting a survival war. They asked people to migrate to the State. When migrants get there they ask them what they learnt, what they studied and they will assign them accordingly to a diwan or a district or they will recruit them as inghimasi. I, *cousin*, want to go be an inghimasi soldier!

This process that Alebbini identified was part of ISIS's administration, according to expert testimony from Dr. Lorenzo Vidino, the Director of the Program on Extremism at the George Washington University. Alebbini also told the FBI in his post-arrest interview that once he was released from prison, "my country is going to be the Islamic State." And as discussed with

regard to Count 2, there was evidence that Alebbini may have informally pledged allegiance to the Islamic State with his cousin Raid.[6]

Alebbini claims that he had not yet ultimately decided whether he would work under the direction and control of ISIS, arguing that at best, he was traveling to the area to determine if ISIS was truly what he was seeing in the propaganda videos. He argues further that his main goal was to fight the Syrian president, Bashar al-Assad. *Id.* Alebbini does not, however, direct the Court to anything in the record substantiating either contention. Even if there was proof to support both contentions, there was sufficient contradictory evidence at trial that Alebbini had already made up his mind about becoming a soldier for the Islamic State at least six days before heading to the airport. Moreover, there was additional evidence suggesting that any apprehension Alebbini displayed was a ruse.

Alebbini's final argument, that his main goal was not to further ISIS, but to fight against the al-Assad regime, is not relevant to the issue of his intent to provide himself to work under the direction and control of ISIS. To prove attempt under § 2339B(a)(1), the Government did not have to establish that Alebbini's main goal was to provide material support to ISIS. So even if that was true, it does not alter our decision. Section 2339B(a)(1) prohibits the attempted provision of material support to terrorist organizations, regardless of Alebbini's primary goal. *See* 18 U.S.C. § 2339B(a)(1).

## III. CONCLUSION

Viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We therefore **AFFIRM** the district court's judgment.

---

[6]In his reply brief, Alebbini disputes that he pledged allegiance to ISIS with his cousin Raid. He points the Court to trial testimony indicating that the alleged pledge of allegiance to ISIS was in fact a more general pledge to defend "Syrian blood." There was trial testimony to that effect, but the same witness also testified that Alebbini and Raid had, on another occasion, "sworn allegiance to the Islamic State." As noted above, our role is not to reweigh this evidence. *See Jackson*, 443 U.S. at 319.