NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0502n.06

No. 12-1466

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*May 20, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| MARTIN CASTANON-CAMPOS, | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |

Before:  ROGERS, WHITE, and ALARCÓN[*], Circuit Judges.

ALARCÓN, Circuit Judge.     Defendant-Appellant Martin Castanon-Campos was convicted by a jury of two counts of unlawful use of a communication facility in violation of 21 U.S.C. § 843(b) and one count of attempt to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846.  Castanon-Campos only appeals from his conviction for

_____

[*]The Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

1

attempt to possess with intent to distribute cocaine, arguing that the prosecution presented insufficient evidence to the jury to support the conviction.

We affirm the jury's verdict because we conclude, after reviewing the evidence presented at trial in the light most favorable to the prosecution and drawing all available inferences and resolving all issues of credibility in favor of the trier of fact's verdict, that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**I**

The facts are not in dispute. While conducting a separate investigation, DEA Agent Jeffery Moore learned that Orlando Perez was involved in drug trafficking. Agent Moore contacted Perez about assisting in DEA investigations. Perez agreed to assist Agent Moore as a confidential informant. Perez told Agent Moore that Castanon-Campos had previously sold him multiple kilograms of cocaine. This information led to the DEA's investigation of Castanon-Campos. Perez aided the DEA in an undercover operation seeking to purchase drugs from Castanon-Campos, beginning on March 17, 2010, when he recorded two phone calls he placed to Castanon-Campos to inquire about purchasing five kilograms of cocaine.

The first call was successfully recorded. At trial, Agent Moore read the transcript of the call to the jury. In so doing, he interpreted all of the coded language contained in conversation transcripts based upon his experience in deciphering coded language used during drug-trafficking

communications.  Perez told Castanon-Campos that he, or an associate of his, was interested in purchasing four or five doors [kilos of cocaine] from Castanon-Campos.  Castanon-Campos responded, "All right then."  Perez then asked if Castanon-Campos could lower the price and Castanon-Campos replied that the cost was currently more expensive.  Perez asked for "the same price as before."  Castanon-Campos replied, "Uh-huh," and stated he would talk to the people who made the doors to see if he could get a lower price.

Castanon-Campos ended the conversation by telling Perez he would call him from a different phone number so "you can use that one, not this one."  Agent Moore testified that having two phones is common in drug trafficking because drug dealers will often use one phone for personal calls and one for drug transactions.

On April 15, 2010, Perez placed and recorded another call to Castanon-Campos in which Perez mentioned a friend [Luis Velez] as an interested buyer.  Castanon-Campos asked if Perez knew that he had been trying to contact him.  Perez stated that he did and explained that he had been on vacation.  astanon-Campos stated he had some "really nice tennis," meaning good quality cocaine. Perez asked Castanon-Campos if he still had cocaine in his possession.  Castanon-Campos responded that he no longer had it but he would receive another smaller quantity soon and Perez needed to have his phone on so Castanon-Campos could contact him.

Perez explained to Castanon-Campos that a friend of his [Velez] was coming into town and "wants to fix an apartment," meaning that he wanted to buy cocaine. Perez asked Castanon-Campos, "Can it be done?" Castanon-Campos replied, "Yes." On April 19, 2010, Perez called Castanon-Campos to tell him that Velez was flying into Detroit and that the two of them would like to meet with Castanon-Campos the following day.

On April 20, 2010, Castanon-Campos, Perez, and Velez met at a restaurant. Their conversation was recorded by a body wire. During the conversation Castanon-Campos told Perez that he has access to "several houses to rent. . . . [A]bout ten." Agent Moore testified this statement meant that Castanon-Campos "ha[d] ten kilos" of cocaine. Castanon-Campos then said his supplier needed "one month's rent," the coded expression for the cost of one kilo. Castanon-Campos stated: "[The deal] has to be between today and tomorrow. Really, the earliest it can be done." He suggested doing the transaction near his residence because "it's more peaceful." Agent Moore testified that the term "more peaceful" meant where there are not a lot of police. Velez gave Castanon-Campos his phone number and said he would like to do a deal with Castanon-Campos, but that he did not want a deal if it was "just for three or four" kilos.

Following the conversation, Castanon-Campos, Perez, and Velez went to the restaurant's parking lot. They walked to a parked Hummer 2 provided by the DEA that had $150,000 hidden in the trunk. Perez and Velez conducted a "money flash" wherein they demonstrated to Castanon-

Campos an ability to pay for the cocaine by showing Castanon-Campos the money hidden in the trunk compartment. Castanon-Campos, Perez, and Velez then departed after a brief conversation.

On June 5, 2010, Castanon-Campos spoke with Velez on the phone and told him that Castanon-Campos had cocaine and that Velez needed to come to Detroit to give him the money. The call was not recorded. Castanon-Campos called Velez several times over the next couple of days, but Velez did not answer because his cover story was that he was driving from Miami to Detroit and would not have cell service.

On June 8, 2010, Velez answered another phone call from Castanon-Campos. Castanon-Campos said he had been trying to contact Velez for two days because there was a "big problem." He informed Velez that he received a delivery of "shoes," or kilos of cocaine, and that some of the kilos were adulterated and very poor quality, while others were "originals" and good quality. He said that the "shit hit the fan" and things "are really bad." Velez responded by offering to purchase the lower quality cocaine anyway. Castanon-Campos reiterated how poor the quality was and said, "I did not want to get into that mess until they take care of it. That's why I called you, so you won't run a stupid errand." Velez told Castanon-Campos that "in any event" he had the "paperwork," the coded term for money, for the purchase and wanted to get together. They finished their conversation by agreeing to meet the following day.

Instead, they met later the same day at a restaurant in Detroit. At that meeting, Castanon-Campos reiterated to Velez that the cocaine was adulterated and that he tried to call Velez so that he "wouldn't run that errand . . . because it wasn't good." They discussed at length the poor quality of the sixty kilos of cocaine that Castanon-Campos said were delivered. At one point Castanon-Campos asked Velez, "And just in case something were to arrive next week, how would you want to do it? Because I don't think those guys are going to accept the twenties when we just get there. They are not going to trust - -." Agent Moore testified that, using coded terms, Castanon-Campos was informing Velez that, "If my people get more cocaine next week, how do you want to proceed with this because I'm telling you now, they're not going to want to do 20 [kilos] in one purchase." In response, Velez proposed to make Castanon-Campos's associates more secure with the transaction by performing half the transaction in the morning and the other half in the evening. Castanon-Campos did not respond to this offer. Velez then mentioned to Castanon-Campos that he would have difficulty paying the quoted price of $23,000 to $24,000 per kilo.

Velez testified that once drugs have been adulterated, there is a lot of mistrust within a drug trafficking organization and that he "knew that until all that problem was resolved, it was going to be hard for [Castanon-Campos] to obtain new drugs." Accordingly, after the June 8, 2010 meeting, the DEA decided to end the undercover operation without seizing any drugs.

Four months later, on October 6, 2010, the DEA executed an arrest warrant for Castanon-Campos. Agent Moore testified that Castanon-Campos waived his Miranda rights and then provided a written statement in Spanish. The relevant portion of Castanon-Campos's statement is as follows:

> Approximately one year ago, I did three drug deals with Tony Gonzalez and with Orlando [Perez], two times for a kilo and the third time for two kilos, but I never reached my destination, because two narcotics policemen stopped me on the street and took them away from me and let me go.

On March 29, 2011, a grand jury indicted Castanon-Campos for two counts of unlawful use of a communication facility in violation of 21 U.S.C. § 843(b) and one count of attempt to possess with intent to distribute five kilograms or more of cocaine. Castanon-Campos was tried before a jury between September 21 and 26, 2011, and at the close of the prosecution's case, Castanon-Campos moved to dismiss all charges pursuant to Rule 29(a). The district court denied the motion.

On September 27, 2011, a jury convicted Castanon-Campos on all counts. The district court sentenced Castanon-Campos to 41 months' incarceration for each conviction of unlawful use of a communication facility and 121 months' incarceration for his attempt conviction, to run concurrently.

Castanon-Campos filed a timely notice of appeal limited to the judgment of conviction for attempt to possess cocaine with the intent to distribute it. The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

**II**

When a criminal conviction is appealed "on the grounds that the evidence is insufficient to support the conviction, the reviewing court determines whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Pennyman*, 889 F.2d 104, 106 (6th Cir. 1989) (internal quotation and citation omitted). This review is de novo. *United States v. Mabry*, 518 F.3d 442, 447–48 (6th Cir. 2008). This Court "view[s] both circumstantial and direct evidence in a light most favorable to the prosecution . . . [and] draw[s] all available inferences and resolve[s] all issues of credibility in favor of the [factfinder's] verdict." *United States v. Jenkins*, 345 F.3d 928, 940 (6th Cir. 2003) (internal quotes and citations omitted).

To convict an individual of attempt, "the government must demonstrate a defendant's intent to commit the proscribed criminal conduct together with the commission of an overt act that constitutes a substantial step towards commission of the proscribed criminal activity." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999). A "substantial step consist[s] of objective acts that mark the defendant's conduct as criminal in nature. . . . [When] taken as a whole, [the acts] must unequivocally corroborate the required subjective intent to purchase or sell actual narcotics." *Id.* The substantial step requirement is an objective one. *Id.* "[W]hen a defendant engages in active negotiations . . . , he has committed the 'substantial step' towards the crime of possession required

to convict him of attempted possession." *Id.*; *see also United States v. Samuels*, 308 F.3d 662, 666 (6th Cir. 2002) (holding the same). "Demonstrating a 'substantial step' does not require a physical act; a defendant's words alone can be 'a substantial step.'" *United States v. LaPointe*, 690 F.3d 434, 444 (6th Cir. 2012). The determination whether a defendant had the specific intent to commit the crime is a separate inquiry. *Bilderbeck*, 163 F.3d at 975.

### III

### A

Castanon-Campos contends that for active negotiations to constitute a substantial step, they must result in a confirmed deal, and that because "the material elements of a drug deal were never solidified," the Government presented insufficient evidence to support a finding that he took a substantial step. Appellant's Br. at 15–16. Specifically, he asserts that no quantity of cocaine was agreed to, and that even if a quantity was determined, the price per kilo and the date for the transaction were never established. *Id.* at 16. We disagree that proving an attempt to possess cocaine with the intent to distribute it requires a confirmed deal based on active negotiations. In *United States v. Evans*, 699 F.3d 858 (6th Cir. 2012), this Court stated that "[w]e have crimes of attempt because the *mens rea* involved is not diminished by failure." *Id.* at 867 (internal citation omitted). "Demonstrating a 'substantial step' does not require a physical act; a defendant's words alone can be 'a substantial step.'" *LaPointe*, 690 F.3d at 444.

In *Bilderbeck*, this Court upheld a conviction for attempt to possess cocaine with intent to distribute based on the following evidence. A confidential informant placed a call to Bilderbeck and told him "he was bringing 'white doors' (cocaine) to Detroit." 163 F.3d at 973. Bilderbeck responded, "I'll take them all [the cocaine] as long as the price is fair." *Id.* Bilderbeck met the informant in a hotel room and sampled the cocaine. *Id.* When the informant asked how much he wanted to purchase, Bilderbeck "provid[ed] varying answers ranging from 'two or three' kilos to 'all of them.'" *Id.* An undercover agent that was present at the hotel testified at trial that the parties "did not make an agreement on price." Bilderbeck left the hotel to "get a hold of them [his customers]" and he met an individual and had a conversation in his car. *Id.* Bilderbeck then called the informant and said he spoke to "his friend." *Id.* Bilderbeck returned to the hotel and "indicated his desire to take possession of the cocaine" and wanted the informant to front him the cocaine. *Id.* at 973–74. Bilderbeck left the hotel, returned a second time, and "indicated his desire to take the cocaine." *Id.* at 974. Bilderbeck asked again to have the drugs fronted to him, but "suddenly changed his mind, indicating that he did not want to take possession of the cocaine because it was too late to distribute it that day." *Id.* Bilderbeck left the hotel and called the informant later that evening, telling him that some of his customers were bidding on the cocaine and that he would know for sure how much they wanted later. *Id.* Based on this evidence, this Court held that "a rational trier of fact could have

found that these acts constituted active negotiations to purchase drugs and, thus, that Bilderbeck had undertaken a 'substantial step' towards possession of the cocaine." *Id.* at 977.

In *Pennyman*, the defendant approached an individual from whom he had previously purchased cocaine and asked whether he could get "*another* couple of ounces" for $2,200. 889 F.2d at 105 (emphasis in original). The dealer said he could not "'do anything til about ten in the morning'" and changed the subject to talk about a mutual acquaintance who had been "bragging" that Pennyman had given her drugs before. *Id.* Pennyman did not purchase or possess any narcotics from the dealer following this conversation. This Court held that "a defendant may be found to have taken a 'substantial step' for the purpose of an *attempt conviction* though he or she has failed to gain possession of drugs or 'sham' drugs." *Id.* at 107.

The instant case differs from those discussed in that the negotiations recorded and testified to were between the defendant and the prospective buyer, not between the defendant and prospective seller. In other words, the negotiations establish Castanon-Campos's intent to sell cocaine to Perez and constitute a substantial step to do so. But those negotiations do not establish an intent and substantial step to obtain or possess the cocaine. These elements must be gleaned from Castanon-Campos's statements and representations to Perez.

In that regard, the Government presented evidence that Castanon-Campos discussed supplying four or five kilos of cocaine to Perez and that he would seek to get the drugs at a lower

11

price from his source. He told Perez he could call him the next time he received cocaine. The record

also shows that Castanon-Campos told Perez that he had access to ten kilos of cocaine, and he

expressed his preference to do the transaction soon and possibly near his residence.

The record demonstrates that Castanon-Campos attempted to possess cocaine to distribute

to Velez. He stated that he intended to call a distributor, that he had access to ten "apartments," that

he had previously possessed "nice tennis," and that he had access to large quantities of adulterated

cocaine. After considering Castanon-Campos's statements and conduct, a rational trier of fact could

conclude beyond a reasonable doubt that he engaged in active negotiations to attempt to possess

cocaine for distribution.

**B**

Castanon-Campos also contends that the Government failed to present sufficient evidence

to persuade any rational trier of fact that he had the specific intent to possess cocaine with the intent

to distribute it. He asserts that

> [e]ven if the Court were to conclude that Castanon[-Campos] took a substantial step
> toward the commission of the attempt offense, the substantial step was not sufficient
> to "corroborate the firmness" of Castanon[-Campos]'s intent. . . . Castanon[-
> Campos] did not commit any acts that objectively "corroborated the firmness" of his
> intent. Put simply, he did not have the requisite intent to possess cocaine for the
> purpose of distribution.

Appellant's Br. at 18. Although the Government must prove both a substantial step and the requisite specific intent, whether objective evidence "corroborates the firmness" of an accused's intent to accomplish a crime is a challenge to the substantial step element of an attempt crime and not to an accused's subjective intent to commit the crime. *Bilderbeck*, 163 F.3d at 975. In any event, Castanon-Campos's objective conduct unequivocally corroborated that he intended to commit the crime.

The Government presented sufficient evidence at trial for any rational trier of fact to determine beyond a reasonable doubt that Castanon-Campos took a substantial step to possess with intent to distribute five kilograms or more of cocaine and that he had specific intent to accomplish the crime.

**AFFIRMED.**