RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0079p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTIAN FERGUSON,

*Defendant-Appellant.*

No. 21-3800

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:20-cr-00262-1—Solomon Oliver, Jr., District Judge.

Argued: October 18, 2022

Decided and Filed: April 20, 2023

Before: BATCHELDER, BUSH, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

BATCHELDER, J., delivered the opinion of the court in which DAVIS, J., joined. BUSH, J. (pp. 16–23), delivered a separate dissenting opinion.

───────────────

## OPINION

───────────────

ALICE M. BATCHELDER, Circuit Judge. We are asked to grant extraordinary relief. Christian Ferguson asks us to overturn his jury conviction on the ground that there was

insufficient evidence to support the conviction. To do so, we must find that no rational juror could have found Ferguson guilty beyond a reasonable doubt. Certainly, this standard, established in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), sets a high bar—respecting the solemn role the jury plays in our criminal justice system. Sufficiency review also fulfills a solemn role, guaranteeing that no person is criminally convicted, and thereby deprived of liberty, without due process of law. U.S. CONST. amend. V. It ensures that criminal convictions are supported by sufficient evidence, because anything less undermines the integrity of the judicial process. The jury convicted Ferguson on insufficient evidence, in violation of *Jackson* and the Fifth Amendment. We therefore reverse the judgment of the district court.

## I.

Ferguson, a black man from Cleveland, then 20 years old, aroused FBI suspicion in March 2020 with his internet postings. Ferguson led an online chat room on the Discord platform[1] known as the 75th Spartans. In this chatroom, Ferguson, whose moniker was "Grinch75R," described his desire to create a militia group and revolt against tyranny. On March 18, 2020, Ferguson wrote that he wanted to organize the Spartans into "centurions to orchestrate raids for supplies such as weapon and armor." On April 7, 2020, Ferguson asked a member of the chatroom, a 14-year-old with the moniker "SecretAgentRandyBeans," whether he could drive because Ferguson wanted to do a "small claim" with the cops and "leave a calling card with the Spartans name." Ferguson stated he had not found any recruits yet. In response, SecretAgentRandyBeans stated he could "kinda drive."

On April 14, 2020, an FBI confidential informant, known as "Guiness," contacted Ferguson on Discord, posing as a U.S. Army veteran who was interested in joining the Spartan group. Ferguson was suspicious and asked members of the Spartan group to investigate Guiness's background. Eventually, suspicions dispelled, Ferguson approved Guiness and added him to the Spartan group channel.

---

[1]Discord is a communication platform that allows text and voice chats among individuals in a secure chat room.

On April 15, while chatting with Ferguson, Guiness stated that he had been "training at home with another guy" and invited Ferguson to join them. Ferguson did not respond. Two days later, on April 17, Guiness contacted Ferguson again and asked to meet, offering to "[n]ail down some times we can start training small unit tactics?" Ferguson agreed and they met the next day (April 18) at the Metroparks near the Cleveland Zoo.

Two days later, Guiness via Discord asked Ferguson to meet again that coming Sunday so they could "do some land nav/hiking." Ferguson agreed. Guiness suggested meeting at Camp Belden in Grafton, Ohio. On April 26, however, Ferguson said he had to reschedule because his bank card was giving him trouble. Guiness followed up on April 28, saying,

> [W]e gotta get together soon. If any kind of strike or something similar is going to happen in the near future, i gotta kno so i can plan accordingly. If u dont have a good plan, then u plan on losing. If im going to be part of something, i gotta be kept up to speed so i don't get blind sided.

Ferguson said he was "good to go" for that weekend to meet and train.

Also on April 28, chatting with the entire Spartan group, Ferguson detailed for the first time an idea for a potential "strike." He wrote,

> Mainly this is the plan. We call a patrol car out to the open location. When he comes to check out the location, we ambush him and subdue him, raid his cruiser, and strip him of all his weapons and send him walking home brushed and with our calling card. That's why we need something that will get members and finally get a spark going.

Ferguson then equivocated in response to some chats, writing,

> It's not happening right now. I'm saying that's going to be the first move we don't have a date in stone right now im laying what will be . . . I tried telling him this is the plan but were not putting it into action just yet. I'm laying out the groundwork.

After Guiness joined the chat, Ferguson continued,

> We need to keep the ops small but loud. We still building numbers, but this will get Patriots and future Spartans interested. We also can't afford martial law to be installed until I know all my pilots are fully armed and armored up. I still need a sidearm and waiting on my Armorsmith . . .

[Reponses from other Spartans]

We need four people for this work, three minimum . . . We hit a sheriff or police cruiser that [has] AR. Take to fed Brady armor and equipment. If we get our hands in a radio, we'll be able to plan around them.

Guiness and Ferguson finally met at Camp Beldon on May 2, this time joined by a second FBI informant, known as "Steve." At Guiness's request, Ferguson brought his AR-15 rifle. During this meeting, the group engaged in faux military exercises and hiked the woods. Guiness and Steve recorded the whole meeting with a hidden bodycam. While hiking, Ferguson talked more about his idea:

What I was thinking was the first thing that gets someone's attention, and once you make some type of calling card . . . Get a cop patrol car. One or two. Have them come out to like a little – basically like a domestic violence call. Call them out and just tip out the car that try to go to the house where the call, so called house that's basically abandoned…Everyone surrounds them. And they give options. Either like…either put your…lay your pistol on the ground or get shot immediately. 10 seconds to comply. They don't do anything, either they lay down or we put them down. And then after I take their gear, and take their com and get that police radio out of that damn cruiser…

And if they don't get it the first time, we'll do it as many damn times as we have to until we start seeing something on Fox or something like that saying a group called Spartans is . . . out killing police officers and shit like that.

(closed ellipses in original to indicate patterns of speech).

Later, during that same hike, Guiness asked Ferguson to lay out his thoughts again. Ferguson then drew a diagram in the dirt, describing his idea for a strike in more detail, stating that Russ, a.k.a. "SecretAgentRandyBeans," the fourteen-year-old boy from Tennessee, would help find a girl who could fake the domestic violence call. Ferguson mentioned they might have to handcuff the officers while they stole their gear. Ferguson then told Guiness and Steve that he was thinking of putting his idea into practice around "the end of the month or even June."

Between May 2 and May 5, Ferguson's and Guiness's communication consisted of Discord chats about gun models and ju jitsu. On May 5, without any request by Ferguson, Guiness sent a Google maps picture of an abandoned house in Cuyahoga Valley National Park, saying, "Check it out. Theres more than one abandon house on this road. Perfect location

tactically.  Take a look tell me what u think.  Maybe we should recon it fri."  Ferguson asked Guiness to send the location to the larger group chat because he wanted some input.

On May 8, Ferguson, Guiness, and Steve met for a third time, starting at a Subway restaurant, and then proceeding to Cuyahoga Valley National Park.  Guiness drove.  They carried no weapons to the park.  In the car on the way to the park, Ferguson said that because police cruisers arrive minutes apart, that "we're probably gonna have to um . . . make it even faster. . . .[M]ainly to get the guns and gear off of their body . . . and just get out of there under, in three minutes."  Later in the car ride Ferguson stated, "right now, I'm just trying to get more people."  They arrived and parked the car near a barn-like structure before hiking to find the abandoned house.

They proceeded towards the abandoned house, with Ferguson saying that if multiple cops responded to their call, they'd have to start shooting some in the head.  As they approached the house, Ferguson described the area as "perfect."  After scoping the interior of the abandoned house, Guiness stopped Steve and Ferguson saying, "Alright listen guys.  You too Steve.  I know we already talked about this, this is serious shit, I know it's just the recon now, but is everybody good?"  Ferguson responded, "I'm down . . . I want in."

Guiness then suggested that they conduct a "dry run" of the plan by placing a fake call to law enforcement and timing how long it would take the officers to get there.  Ferguson agreed and Guiness placed the call.  The three waited in the woods and watched for the park rangers.  After the rangers arrived, Ferguson, Steve, and Guiness ran away from the rangers back towards the barn where their car was parked.  When they got to the barn, police officers arrested all three men (to make Ferguson believe Guiness and Steve were suspects as well).

The FBI obtained and executed a search warrant for Ferguson's residence, seizing an AR-15 rifle, ammunition, magazines, tactical gear, and a guerilla warfare manual.  The government charged Ferguson with two counts of attempted kidnapping in violation of 18 U.S.C. §§ 1201(a) and (d).  After a two-day trial, Ferguson moved for a judgment of acquittal, which the trial court denied.  The jury returned a guilty verdict and Ferguson appealed.

**II.**

We review de novo a district court's denial of a motion for a judgment of acquittal to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Burris*, 999 F.3d 973, 976 (6th Cir. 2021) (quoting *Jackson*, 443 U.S. at 319 (emphasis deleted)). We consider all evidence in the light most favorable to the prosecution. *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005). Where the conviction is for an attempt, the government must have proved that the defendant both intended to commit the underlying offense and committed a "substantial step" towards the commission of that offense. *Id.* at 618.

**III.**

Ferguson was charged with attempted kidnapping in violation of 18 U.S.C. § 1201, which provides,

> (a)Whoever unlawfully seizes, confines, inveigles, decoys, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when . . .
>> (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States; . . .
>> (5) the person is among those [federal officers or employees] . . . and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties,
> shall be punished by imprisonment . . .

This statutory language requires four essential elements for a completed kidnapping offense: 1) the defendant unlawfully seized, confined, inveigled, decoyed, abducted, or carried away the victim, 2) the defendant held the victim, 3) the holding was for ransom or reward or otherwise, and 4) the defendant did so in a manner to create federal jurisdiction. *See* 18 U.S.C. § 1201(a). Subsection (a) prohibits kidnapping in its completed form. Subsection (d) of that same section provides, "Whoever attempts to violate subsection (a) shall be punished by imprisonment for not more than twenty years."

Ferguson does not dispute that his plan would have, at minimum, involved the seizing of federal officers on federal land. Nor does he argue that any holding was not for ransom or reward or otherwise. Rather, Ferguson denies that he held or intended to hold at all.

Holding, under the kidnapping statute, requires an "unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." *United States v. Ingram*, 846 F. App'x 374, 383 (6th Cir. 2021) (citing *Chatwin v. United States*, 326 U.S. 455, 460 (1946)). Remarkably little case law elucidates the standard set down in *Chatwin*. To date, only one Sixth Circuit case has considered the contours of a "holding" and did so in the context of deciding whether the alleged confinement was against the victim's will. *Ingram*, 846 F. App'x at 383-84. No case has squarely considered the required duration of an "appreciable period," i.e., how long a momentary seizure must continue to become a federal kidnapping.

*United States v. Small*, 988 F.3d 241 (6th Cir. 2021), provides no clarity. *Small* involved two defendants who broke into an elderly woman's home, tied her up with telephone wire for approximately 20 minutes while they ransacked the home for valuables, and fled. *Id.* at 248. The defendants challenged their kidnapping convictions on the basis that they had no proscribed purpose (i.e., that any purported holding was not *for* ransom or reward or otherwise), a challenge which the court rejected. *Id.* at 249. The defendants did not challenge their conviction on the ground that their actions did not constitute a "holding," and thus the court had no occasion to consider the question. *Small* did not clarify the holding element and provides little guidance here.

Ferguson urges us to follow a Ninth Circuit case that construes § 1201(a) as requiring "more than a transitory holding." *United States v. Jackson*, 24 F.4th 1308, 1312 (9th Cir. 2022). Otherwise, a "garden-variety, three-minute robbery could be a kidnapping," *id.*, and "the boundaries of potential liability would be lost in infinity." *Chatwin*, 326 U.S. at 464. This argument is not without force. A liberal conception of the holding element not only creates sweeping criminal liability such that virtually any crime involving contact with the person of another could be charged as a kidnapping, but it also strains the text. As the Ninth Circuit observed, "[m]eaning has to be given to the phrase 'and holds' beyond the conduct already denoted by 'seizes' and 'confines.'" *Jackson*, 24 F.4th at 1312.

However compelling Ferguson's arguments, we cannot adopt them in this case, primarily because we *cannot know* whether his plan would have involved a kidnapping. We can only

consider hypotheticals based on Ferguson's verbally expressed ideas, many of which are inconsistent.

Take for example his statements on May 2. Ferguson initially told Guiness and Steve that he wanted to surround the officers and take their gear, thus describing only a robbery. Later that same day, however, Ferguson stated that they might have to handcuff officers while they took their gear, actions which might indicate a longer holding to complete the robbery. On May 8, however, Ferguson changed his plan, saying that they would have to take the gear quickly and in under three minutes, acts which would constitute a robbery without any "holding." Yet again on May 8, Ferguson darkly described the possibility of needing to kill most of the officers.

Two things become clear from Ferguson's statements. First, any possible plan was in its infancy, as it was constantly changing. Second, Ferguson had not decided and apparently *did not know* what he wanted to do with the officers other than take their gear and leave them with a "calling card." Given the mixed facts and the even more uncertain legal issue, we cannot resolve this case based on whether Ferguson did or did not intend a kidnapping. We therefore must proceed to the "substantial step" analysis.

**IV.**

The same two features of Ferguson's plan that caution us against construing the apposite language of § 1201—that is, the plan's preliminary nature and its uncertain relation to his kidnapping charge—lead us to hold that Ferguson did not commit a substantial step towards kidnapping.

A substantial step must consist of an "overt act" which objectively marks the defendant's conduct as criminal in nature. *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999). The act must unequivocally corroborate the firmness of a defendant's criminal intent to commit the offense. *Id.* Preliminary or planning activities are not sufficient to constitute an attempt. *See United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020); *United States v. Price*, 134 F.3d 340, 351 (6th Cir. 1998). A "fragment of the crime" must essentially be in progress. *Price*, 134 F.3d at 351 (quotation marks omitted). The purpose of the "substantial step" requirement is to

ensure against the "danger of convicting for mere thoughts, desires, or motives." *Bilderbeck*, 163 F.3d at 975.

Two principles follow from the corroboration requirement. First, if a substantial step must corroborate or confirm the defendant's resolve to carry out his criminal plan, then the criminal plan must logically precede that substantial step. Second, because a defendant is charged with an attempt to commit a specific offense, and the requisite substantial step must corroborate the intent to commit *the specific offense*, the substantial step must be *toward* the specific offense and its elements. It cannot be generically bad behavior or a separate crime.

Beyond those two principles, little can be gleaned from the standards themselves. What distinguishes "preliminary activities" that do not incur criminal liability from "substantial steps" that do? When is an act sufficiently "overt" to corroborate a defendant's resolve? At what point in the timeline does prosecuting the inchoate plan amount to criminalizing "thoughts, desires, or motives"? *See Bilderbeck*, 163 F.3d at 975.

**A.**

A survey of Sixth Circuit attempt cases provides some limiting principles. Most attempt cases involve defendants caught red-handed, where the substantial step was obvious. However, we can gain insight from a smaller set of cases that, like Ferguson's, involve only inchoate plans of criminal activity. *See, e.g.*, *United States v. Pennyman*, 889 F.2d 104 (6th Cir. 1989); *Bilderbeck*, 163 F.3d 971; *United States v. Castanon-Campos*, 519 F. App'x 403 (6th Cir. 2013); *Alebbini*, 979 F.3d 537.

In *Pennyman*, 889 F.2d at 105, the defendant, a drug dealer, was captured on wiretap talking to a co-conspirator about drug transactions. The defendant was recorded describing some quantity of drugs and then stating he wanted a few more ounces. *Id.* The co-conspirator replied that he couldn't do anything about that until 10:00 am, roughly eight hours later. *Id.* In *Bilderbeck*, 163 F.3d at 973, the defendant sought to buy drugs from a DEA confidential informant. Because the informant, pursuant to DEA instructions, refused to "front" (provide, with expected repayment from proceeds) the cocaine, the defendant promised to secure cash to buy the drugs. *Id.* at 974. The defendant rounded up bidders and stated they could buy the drugs

the next day. *Id.* In *Castanon-Campos*, 519 F. App'x at 404-05, the defendant agreed to sell drugs to an undercover agent. When the drugs came in, the defendant told the agent that they were adulterated, and he could not sell them. *Id.* He then offered to sell the next week's shipment to the agent. *Id.* at 406. In *Alebbini*, 979 F.3d at 541-42, the defendant had numerous conversations with his cousin and an undercover agent about joining ISIS in Syria. He had previously attempted to make his way to Syria via Turkey but was sent back to the United States because of an expired passport. *Id.* at 540. He then booked plane tickets from Cincinnati to Turkey to Jordan and set off for the Cincinnati airport from his home in Dayton. *Id.* at 542. After he picked up his tickets at the airport and headed towards security, the FBI arrested him. *Id.* at 543.

Two traits unite these cases. First, all of the defendants had fully completed their planning, as demonstrated by the fact that each had the means and ability to accomplish his intended crime. Measuring their actions from the future crime and looking back, they had nothing left to do but execute the actus reus. Second, the defendants intended to commit their crimes imminently. In three of the four cases, the crime was a day or less away from being committed. In *Castanon-Campos*, the crime was less than a week away with a date firmly set.

**B.**

Applying these principles to Ferguson's case, we must conclude that he did not take a substantial step, both because his plan was decidedly underdeveloped and exploratory in nature and because his actions did not clearly corroborate an intent to commit the specific offense with which he was charged—namely, kidnapping.

**1.**

Ferguson's idea for an attack against law enforcement was at most in its planning stage. Ferguson had much more planning to do and was not, at the time of his arrest, ready to execute his plan. His early cyber communications with the Spartan channel indicated only a desire to commit a strike at some vague point in the future and the need to have recruits before doing so. Even Ferguson's April 18 meeting with Guiness predated the plan, so that meeting cannot qualify as a substantial step. During the meeting on May 2, Ferguson stated that "SecretAgentRandyBeans" needed to recruit a girl to make the fake domestic violence call, and

that other recruits would need to obtain rifles.[2]  On May 8, before the trio ever arrived at the National Park, Ferguson indicated that he still needed to recruit more people.  He also said that the one person who was willing to participate, "SecretAgentRandyBeans," the fourteen-year-old too young to drive, needed to figure out how to join the group without attracting the attention of his parents.  Furthermore, Ferguson went to the National Park to determine *whether* that location was suitable and *whether* they would move forward at all.  Indeed, Ferguson did not expect a "dry run" when he went with Guiness and Steve to the National Park on May 8.  Even if he had wanted to, Ferguson was not prepared on May 8 to effectuate a kidnapping in the near future.

Ferguson had no timeline for his plan let alone an intent to execute it imminently.  On May 2, Ferguson vaguely stated the possibility of organizing for a raid more than a month into the future.  On May 8, Ferguson stated "right now, I'm just trying to get more people."  As FBI confidential source "Steve" admitted at trial, Ferguson never provided a date or timeline for the plan.  The government pointed us to no Sixth Circuit case in which an attempt conviction was predicated on a plan as far in the future as Ferguson's here.  Every case we have found that sustained an attempt conviction for an offense to take place more than a few days in the future involved a set time and date between well-resourced drug dealers.  *See Castanon-Campos*, 519 F. App'x at 404-05.

## 2.

Ferguson's plan was not only in its preliminary planning stage, but also was unclear as to whether it would involve a kidnapping if completed.  Kidnapping requires, as an essential element of the offense, a holding for an appreciable period.  *See Chatwin*, 326 U.S. at 460.  From Ferguson's repeated statements, it is unclear whether his plan would have involved such a holding.  The only consistent theme of Ferguson's statements was that he wanted to lure officers to some location and take their gear, acts which likely would likely have constituted only a robbery.  Had he *adapted* his plan to evolving circumstances, he might have ended up kidnapping officers.  We will never know.  What we do know, however, is that the government

---

[2]The government makes much of the fact that Ferguson brought his AR-15 rifle to the Camp Beldon Park on May 2.  Not only was this firearm legally owned, but Guiness *requested* that Ferguson bring his gun to the park for purely recreational purposes.  Ferguson's possession of a legally owned firearm in a legally carried location for a legal purpose is not corroborative of an intent to commit a kidnapping.

had to prove beyond a reasonable doubt that Ferguson overtly acted in a way that "unequivocally corroborated" his intent to kidnap someone. *Bilderbeck*, 163 F.3d at 975.  No reasonable juror could find that the government met that burden.

To commit attempted kidnapping, Ferguson had to take a substantial step not only in furtherance of the global concept of his plan, but also toward a holding of the officers against their will and for an appreciable period of time.  None of his acts prior to May 8 meet this mark.  He had no recruits, no location, no date or deadline, and not even a consistently expressed goal regarding how he intended to treat any responding officers.  His conduct on May 8 does not support his conviction either.  During that meeting with Guiness and Steve he described the abandoned-house location as "perfect" and assessed lookout posts for potential recruits.  He also agreed, after Guiness suggested it, to determine how long it would take for officers to arrive at the remote location.  And, after the officers did arrive, Ferguson, Guiness, and Steve ran *away* from the scene, demonstrating that Ferguson had no intent to carry out any kidnapping that day.  None of Ferguson's acts unequivocally demonstrate a resolve to hold any officer against his or her will for an appreciable period of time.  These acts might corroborate an intent to *decoy* the officers, and given the consistent theme of Ferguson's plan, possibly *rob* them as well.  They do not, however, corroborate an intent to abduct or hold.  Were this plan to come to fruition, a holding *might* very well occur.  But, without more evidence, a jury cannot convict Ferguson for a crime that *might* have happened during some contingency of a *future* plan which still required much preparation.

## C.

The government poses three arguments to support its claim that Ferguson committed a substantial step towards kidnapping.  All are unconvincing.

### 1.

The government argues that Ferguson committed a substantial step prior to his first meeting with Guiness and Steve on May 2 through his Discord chats with the Spartan group and his supposed acquisition of gear.  However, Ferguson's Discord chats preceded his first suggestion of his plan for a raid and were only exploratory in nature, as the government itself

was forced to concede at oral argument.  Furthermore, the government admitted it did not know when Ferguson acquired his gear, and the record demonstrates unequivocally that he at minimum owned his AR-15 rifle prior to espousing his idea on April 28.

**2.**

The government argues that Ferguson's verbal and visual descriptions of his idea on May 2 and May 8 constituted a substantial step, because words alone are sufficient to sustain an attempt conviction.  The government mischaracterizes the law.  Neither of the cases it cites, *United States v. Bailey*, 228 F.3d 637 (6th Cir. 2000), and *United States v. LaPointe*, 690 F.3d 434 (6th Cir. 2012), stands for the proposition that words alone can constitute a substantial step as a categorical matter.  Both cases involved defendants whose words directly effectuated the crime by their very utterance, rather than simply *expressing* a criminal *idea.  See Bailey*, 228 F.3d at 639-40 (defendant found guilty of attempted enticement of a minor by messaging girls to meet with him); *LaPointe*, 690 F.3d at 444 (defendant found guilty of attempted possession of drugs because he called a dealer to arrange the transaction).  Here, Ferguson's words were entirely aspirational in nature, discussing a criminal idea rather than effectuating a specific crime.  The government provides no case that supports the proposition that mere discussion of a criminal idea—without some action—is sufficient to constitute an attempt.  On the contrary, absent a defendant's speech effectuating a crime, mere discussion of a criminal idea is not a substantial step because a "fragment of the crime" is rarely committed by speech alone.  *See Price*, 134 F.3d at 351.

**3.**

The government argues that visiting a possible location for a future crime constitutes a substantial step and cites *Wesley*, 417 F.3d 612, as support.  In that case, Wesley asked a friend, Deborah Reid, for details about her bank, saying he intended to rob the bank.  *Id.* at 615.  He also asked her to drive the get-away car.  *Id.*  Reid contacted the police, who asked her to agree to Wesley's plan and operate as an informant.  *Id.*  Reid and Wesley drove to the bank (an hour away from where Wesley lived) to scope out the interior and map their escape route.  *Id.*  After surveying the bank, Wesley stated he needed to recruit a couple people but also stated that he

hoped to perform the robbery "tomorrow." *Id.* at 615-16. Because Reid's car recorder malfunctioned, the police asked her to call Wesley again that night and recount the details of his plan and verify his intent to rob the bank the next day. *Id.* at 616. Wesley stated he did not know whether he was going to rob the bank the next day because he had not talked to anyone else yet. *Id.* He then asked Reid why she was asking these questions again and over the phone, making the police believe Reid's cover was blown. *Id.* Wesley was arrested the next day at his house (an hour away from the bank) and the police found no weapons or disguises. *Id.* The court found the evidence was sufficient to sustain Wesley's conviction, saying his overt acts consisted of recruiting Reid to drive the get-away car, attempting to recruit another person to join the robbery, and scoping out the bank. *Id.* at 620.

We cannot reconcile *Wesley* with the present facts. Wesley stated he was planning to rob the bank the *next day*. *Id.* at 615. Ferguson gave no firm date for his plan, vaguely referencing the possibility of performing a strike in June—more than a month into the future. Similarly, Wesley—unlike Ferguson—required little more preparation to complete his plan. Wesley equivocated about his plan in the phone call when he became suspicious of Reid, which tainted his statement and allowed the jury to infer that Wesley was hedging to avoid detection.[3] *Wesley*, 417 F.3d at 616, 619. Ferguson, however, stated numerous times, under circumstances which bolster his credibility, that he was not ready to conduct the strike.

Most importantly, the specific underlying offense was never in question in *Wesley*. Wesley planned to rob a specific bank, a crime which would have happened under any version of his plan. The elements of the crime were never in question. Ferguson, however, was charged with attempted kidnapping, a charge that was two layers removed from reality. Ferguson's charge not only required that he execute his plan but also required that he react a certain way to evolving circumstances *as* his plan was being executed. Under these facts, Ferguson's charged attempted kidnapping is not analogous to Wesley's attempted bank robbery. Rather, Ferguson's conduct would be analogous to Wesley's if Wesley had been charged with attempted murder because he said he *might* have to kill someone *during* the bank robbery. *Wesley* cannot control our analysis.

---

[3]In fact, this was precisely the inference the court drew in his case. *Wesley*, 417 F.3d at 619.

On its face, Ferguson's trip to the National Park on May 8 did not corroborate any resolve to commit a kidnapping and was tainted by the FBI's prompting. The FBI instigated the first non-virtual meeting. The FBI informant pressured Ferguson for a plan and told him if he did not have one, he "planned on losing." The FBI initiated the May 2 meeting, after Ferguson had already cancelled their outing. The FBI initiated the May 8 meeting. The FBI picked the location, on federal land, thereby creating federal jurisdiction. After the men's arrival at the location, the FBI suggested conducting a "dry run." The FBI placed the call to execute the "dry run." At every juncture, Ferguson reiterated the preliminary nature of his plan. At every meeting, he mentioned the need to recruit more people and do more planning.

The government correctly points out that Ferguson did not argue an entrapment defense, which asks whether the government implanted a "criminal design" in the defendant's mind. *See United States v. Pennell*, 737 F.3d 521, 534 (6th Cir. 1984). The government correctly advances its right to conduct sting operations with undercover informants. Both are beside the point. Ferguson's conviction fails not because he is blameless, but because he did not take a substantial step towards the charged offense. The government did not provide one overt act toward the kidnapping that was initiated by Ferguson alone.

On different facts, scoping out the scene of a future crime could constitute a substantial step. In a different circumstance, even the actions of undercover informants could corroborate a defendant's criminal intent. They do not do so here, however, where every overt act was initiated and shepherded by the FBI from beginning to end. The actions of Guiness and Steve are not corroborative of Ferguson's resolve to commit a kidnapping.

## V.

For the foregoing reasons, we reverse the judgment of the district court.

—————————

**DISSENT**

—————————

JOHN K. BUSH, Circuit Judge, dissenting. This appeal presents classic facts from which a reasonable jury could have gone either way as to the defendant's guilt. It is the role of the jury, not us, to determine which version of the evidence to believe.

On the one hand, Christian Ferguson could be viewed as simply a youth engaged in fantasy role play. Today's Tom Sawyer, if you will, "Busy at War" playing "General of one of the armies" in "the public square of the village where two 'military' companies of boys had met for conflict, according to previous appointment." Mark Twain, *The Adventures of Tom Sawyer* 20–23 (New York: Harper & Bros. 1920) (1875).

But, on the other hand, Ferguson could be viewed as much more than a pretend soldier. He was not playing with wooden guns. Instead, he packed an AR-15 rifle. He carried his assault weapon during what could be viewed as part of the planning for a kidnapping. As the majority acknowledges, the defendant hatched a scheme online to "ambush" and "subdue" a law enforcement officer and "strip him of all his weapons." Slip Op. at 3; R. 78, PageID 807. Ferguson was twenty years old—old enough to fight in the U.S. Army, in which he had tried to enlist. And, as the majority also acknowledges, Ferguson stored his AR-15 along with "ammunition, magazines, tactical gear, and a guerilla warfare manual" at his residence. Slip Op. at 5; R. 79, PageID 996–1005. Such weaponry, regretfully, has seen increased use by troubled youth who commit violent and deadly crimes, sometimes after their online "red flag" messages go unheeded by law enforcement.

Ferguson did no harm here because the FBI intervened before he had any chance to carry out his planned criminal activity. But the majority seems to fault the agency for not waiting until something worse had materialized. I do not. If any second-guessing of law enforcement is to be done here, that is the role of the jury, not us.

Though reasonable jurors could have found Ferguson was simply engaged in make-believe, there was enough evidence for them to find that he planned to kidnap for real. Under

governing Sixth Circuit case law, there was sufficient proof for a reasonable jury to determine that Ferguson took a substantial step towards commission of the crime of kidnapping under 18 U.S.C. § 1201 and that, had his plan succeeded, it would have satisfied the holding requirement for kidnapping under that statute.

The jury did not take their burden lightly during this case. Following the one and half day trial, the jury deliberated for two days before reaching a unanimous verdict. After a day of deliberation, the jury notified the district court that they were unable to reach a unanimous decision. In response, the district court provided an *Allen* charge—the pattern instruction given when a jury does not unanimously agree. A day later, the jury returned a guilty verdict, but the jury wanted to express sympathy for Ferguson and asked to write him a note. The note expressed that the members of the jury believed Ferguson to be "a good young man with so much potential" who "will do good things" and that he should "[not] let this define [him]." R. 61, PageID 417. The jury's difficulty in deliberation and desire to express sympathy for Ferguson underscore how difficult the facts of this case are and demonstrate the importance of not supplanting their verdict with our own.

As the majority admits, they grant extraordinary relief, Slip Op. at 1, which requires a determination that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Burris*, 999 F.3d 973, 976 (6th Cir. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). When considering the proof to this end, we do not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury," and we view all evidence in the light most favorable to the prosecution. *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005). While the evidence could support a finding of innocence, it also supports a finding of guilt. We therefore must respect the jury's verdict. I respectfully dissent.

## I.

First, let's consider the proof that supports the jury's finding that Ferguson took a substantial step towards attempting the kidnapping. On appeal he contends, and the majority agrees, that his actions were only "blustery talk" or mere intention. Slip Op. at 8. To avoid a

conviction for mere thoughts and stated desires rather than actual criminal conduct, the Sixth Circuit requires that the defendant take what we call a "substantial step." *United States v. Pennyman,* 889 F.2d 104, 106 (6th Cir. 1989). It "consist[s] of objective acts that mark the defendant's conduct as criminal in nature." *Id.* (cleaned up). We must determine "whether any reasonable person could find that the acts committed would corroborate the firmness of a defendant's criminal intent." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999).

A reasonable person could find Ferguson's acts confirmed his criminal intent. Before interacting with either of the FBI's confidential sources, Ferguson stated his plan for criminal conduct in the Spartan 75's Discord chat. Further, when he met with Guiness and Steve on May 2, 2020, Ferguson practiced tactical exercises with them, and they all discussed the plan at length. It was also during these exercises that Ferguson carried his AR-15.[1] Ferguson then repeated his plan on May 8, 2020, while inspecting a potential location for the ambush, and he conducted a practice run by placing a fake phone call to determine the response time of the park rangers. When presented with the opportunity to back out of the plan, Ferguson reiterated his desire to continue with the plan. All of these actions could serve as objective corroboration of the defendant's criminal intent. *See Bilderbeck*, 163 F.3d at 975.

This conclusion is firmly supported by our decision in *United States v. Wesley*. 417 F.3d 612 (6th Cir. 2005). Wesley was convicted of an attempted robbery of a bank because his actions were determined to be a substantial step rather than mere preparation. *Id.* at 621. Like Ferguson, Wesley traveled to inspect the potential location of the crime, attempted to recruit other members to participate in the crime, and did not disavow his plan when given the chance. *Id.* at 618–20. Wesley was arrested without a weapon or disguise and was not near the bank he planned to rob, so his attempted robbery might not have been imminent. *Id.* at 619. But we still held that the evidence was sufficient to support a reasonable jury's finding that Wesley had taken the requisite substantial step. So too here the proof supports such a finding of a substantial step.

---

[1]The majority notes that Ferguson had legal ownership of his AR-15 and that "Guiness *requested* that Ferguson bring his gun to the park for purely recreational purposes." Slip Op. at 11 n.2. True enough. But a reasonable jury did not have to put on blinders to the facts that Ferguson owned an assault rifle and had demonstrated his willingness to carry it to the park. *United States v. Castro*, 960 F.3d 857, 866 (6th Cir. 2020) ("intent can be proved through circumstantial evidence"). That proof supported the determination that Ferguson was not a pretend soldier but actually a credible threat.

Like Wesley, Ferguson had a plan to commit a crime, had taken steps to scope out the location, had recruited would-be participants in the plan, and had reiterated his commitment to the plan when asked if he wanted to back out. *Id.* In fact, Ferguson had gone further with his planning than had Wesley, given that Ferguson had engaged in special training for the plan and had brought an actual weapon—the AR-15—to that exercise.

*United States v. Alebbini* also provides an apt analogy to demonstrate that Ferguson's actions were enough to qualify as a substantial step towards commission of a crime. *See* 979 F.3d 537 (6th Cir. 2020). Alebbini designed a plan to join the Islamic State of Iraq and Syria (ISIS), discussed the plan with a co-conspirator, and began traveling to where the crime would be completed. *Id.* at 547. Alebbini was arrested at the Cincinnati-Northern Kentucky International Airport, half a world away from Turkey, his ticketed destination, and Syria, his battlefield destination—with lots of time and space to contemplate whether he should back out from his plan to join ISIS. Nonetheless, we upheld Alebbini's conviction. Here the facts supporting a substantial step are even more compelling than they were in *Alebbini*. Ferguson was arrested at the *actual location* of his planned criminal conduct. Like Alebbini, he had designed a plan and discussed it with others. But Ferguson's case presents even more evidence of a substantial step. Unlike Alebbini, Ferguson had made it to his battlefield—the national park—to inspect and approve it. Even if Ferguson could have withdrawn between the time of his arrest and when the kidnapping would have occurred, "the *possibility* of withdrawal, abandonment, or renunciation does not" provide a defense for him. *Id.* at 548 (emphasis original). As *Alebbini* confirms, Ferguson already had traveled far enough and had done enough for a reasonable jury to find he had taken the requisite substantial step.

In holding otherwise, the majority opinion puts us at odds not only with our prior binding precedent but also with at least one of our sister circuits. In *United States v. Sanchez*, 615 F.3d 836 (7th Cir. 2010), the Seventh Circuit held a substantial step had occurred even though the kidnapping was not imminent. *See* 615 F.3d at 844. It was enough that the defendant, Sanchez, was "fully committed and well along the way to putting the kidnapping in motion." *Id.* In fact, "the kidnapping was not imminent at the moment Sanchez was arrested" since he needed at least a week to complete the last steps of preparation for the kidnapping. *Id.* Just as Ferguson's plan

was not necessarily imminent, a substantial step still had occurred because the other actions he took put him well along the way to putting the kidnapping in motion.

For the actions Ferguson did take, along with his expressed commitment to not withdraw from his plan, a reasonable jury could find that Ferguson took a substantial step towards kidnapping the park rangers.[2]

## II.

Second, let's consider the evidence that supports the jury's finding that Ferguson planned to engage in the requisite holding for a kidnapping to occur. Ferguson claims proof was lacking of the requisite benefit of "ransom or reward or otherwise" under 18 U.S.C. § 1201. He also argues that there was no evidence that the park rangers would have been restrained long enough for the requisite holding. Appellants Br. at 36–37.

Ferguson is mistaken about the benefit that must be derived by a defendant to satisfy the holding requirement. In fact, benefit is broadly defined. *See Gooch v. United States*, 297 U.S. 124, 128 (1936). The Supreme Court first considered this in *Gooch*, where police officers were kidnapped and seriously injured. 297 U.S. at 125. The *Gooch* facts line up remarkably well with the plan Ferguson designed, which involved luring the park rangers into an ambush before potentially inflicting serious bodily injury, or even death, upon them. As the Supreme Court explained in *Gooch*, "Holding an officer to prevent the captor's arrest is something done with the expectation of benefit to the transgressor." *Gooch*, 297 U.S. at 128. In contemplation of his plan, Ferguson expected to receive a similar benefit by temporarily holding the rangers and by ensuring they could not call for assistance. The Court in *Gooch* even clarified that the broad term "otherwise" would encompass the benefit of preventing one's arrest even if the word "reward" did not include that benefit. 297 U.S. at 128.

---

[2]The majority appears to find it relevant to the substantial-step analysis that FBI informants were involved with Ferguson. Slip Op. at 15. As the majority acknowledges, however, Ferguson does not argue an entrapment defense, and the government has every "right to conduct sting operations with undercover informants." *Id.* at 15. Again, the majority conflates its role with that of the jury. The latter was entitled to take the government's involvement into account in determining Ferguson's guilt or innocence. But we are not to second-guess the government's methods where, as here, the defendant does not challenge them. In any event, setting aside the actions that the FBI informants took, the fact remains that Ferguson himself engaged in actions from which a reasonable jury could determine he took the requisite substantial step towards commission of a crime.

And as for the required period of physical or mental restraint, *Chatwin v. United States*, 326 U.S. 455 (1946), establishes that it merely must be "an appreciable period": "The act of holding a kidnap[p]ed person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for *an appreciable period* against the person's will and with a willful intent so to confine the victim." *Id.* at 460 (emphasis added). The Supreme Court's use of the word "appreciable" indicates that the time elapsed during the crime does not have to be all that long. Rather, "appreciable" indicates that the period need only be "[c]apable of being measured or perceived." *Appreciable*, *Black's Law Dictionary* (11th ed. 2019). In light of that definition, *Chatwin* establishes that *any* period of time will satisfy the holding period provided that during this period there is a restraint of the victim against the victim's will, done with intent to confine the victim.

Perhaps in recognition that there is no minimum time requirement for a kidnapping holding, there was no challenge raised in *United States v. Small¸* 988 F.3d 241 (6th Cir. 2021), as to whether an appreciable period of holding had occurred in that case. The facts in *Small* resembled Ferguson's planned abduction of the park rangers. Small and the other perpetrators restrained the victim at gunpoint in her home and bound her arms and feet to prevent her from resisting or calling the police. *Id.* at 247, 250. After restraining her, they stole several items from the home before leaving the victim so they could escape without resistance. *Id.* at 247, 250–52. In the same way, Ferguson planned to restrain the park rangers at gunpoint before stealing valuable items from the rangers and escaping without any further resistance from other law enforcement officers.

In *Small*, the victim was restrained for around 20 minutes. *Id.* at 248. On appeal, the defendants challenged the "ransom or reward or otherwise" portion of the kidnapping statute but did not challenge whether a holding of an appreciable period had taken place. That the time period was not at issue indicates that no party questioned that at least a 20-minute seizure satisfies the holding requirement.

Judged against this standard, the evidence supports a jury finding that Ferguson's planned action would have resulted in the requisite holding of the victim for an appreciable period. True, as the majority says, Ferguson "*did not know* what he wanted to do with the officers other than

take their gear and leave them with a 'calling card.'" Slip Op. at 8. But at a minimum, the majority agrees that Ferguson wanted to make an officer exit his vehicle, take off his gear (body armor, gun, and any other equipment), and tag the officer with the calling card. This would all be happening at gunpoint according to Ferguson, and he would take the officer's equipment to prevent him from calling for help. These actions that Ferguson had already decided upon, had they occurred, would have resulted in the park rangers' restraint for a measurable length of time—certainly, at least twenty minutes; likely more. Stripped of their gear and means of transportation and communication, the rangers would have been stranded in the forest—far more isolated from civilization than was the victim trapped in her house in *Small*.

Notably, the jury could find that Ferguson planned not just to rob the park rangers but also to confine them in the national park while he made his escape. Had he only intended a theft of property, this case would be like *United States v. Howard*. 918 F.2d 1529 (11th Cir. 1990). In *Howard*, an undercover DEA agent planned to buy drugs from the defendants with the money he had in the trunk of his car, and the defendants robbed the agent of the money at gunpoint. *Id.* at 1531–32. The Eleventh Circuit determined that there was no attempted kidnapping based on there being "no evidence in the record that appellants intended to detain [the agent] in the [car] beyond the few seconds it would take to secure his car keys and collect the 'buy' money from his trunk." *Id.* at 1536.

But Ferguson schemed for more. Ferguson's plan, if carried out, would have left the park rangers trapped amongst the trees, with no equipment, no vehicle for escape, and no means to communicate for help. Simply put, the rangers would have been not just robbed. They also would have been kidnapped.

### III.

This is a difficult case. On the one hand Ferguson could be viewed as a harmless character. But on the other, he could just as easily be viewed as a potentially very dangerous one. There is sufficient proof under the standard of *Jackson v. Virginia* to support the jury's verdict that Ferguson had taken a substantial step in his criminal conduct that would have

resulted in the kidnapping of the park rangers. The district court's judgment therefore should be affirmed.